# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
|
EMC CORPORATION.                                )
                                                )
            Plaintiff,                          )
                                                )
v.                                              )          Civil Action No. _____
                                                )
PURE STORAGE, INC.                              )
                                                )          Jury Trial Demanded
                                                )
            Defendant.                          )
_____)

## COMPLAINT

1.     This action by Plaintiff EMC Corporation ("EMC") against Pure Storage, Inc. ("Pure Storage") arises out of a deliberate scheme advanced by Pure Storage through a nationwide pattern of collusion with numerous former EMC employees to induce violations of their legal obligations to EMC, to misappropriate and bring to Pure Storage competitively sensitive confidential EMC information and trade secrets, and to use such information to unlawfully interfere with EMC customers and employees.  The activities advanced and directed by Pure Storage are part of a systematic and unlawful strategy intended to identify, target and convert valuable EMC assets for Pure Storage's benefit as Pure Storage seeks to brand itself as an "innovator" in the enterprise storage market, apparently as part of its pre-IPO strategy.

2.     Through this scheme, dozens of former EMC employees have joined Pure Storage and stolen tens of thousands of pages of proprietary, highly confidential and competitively sensitive EMC materials – including highly specific information about EMC's directly competing flash storage solution, EMC's strategies to implement and sell that solution, and targeted, detailed information about EMC's customers and their buying patterns.

3.     EMC here asserts causes of action for misappropriation of trade secrets and confidential information, tortious interference with contractual relations, tortious interference with advantageous business relationships, aiding and abetting trade secret misappropriation, unjust enrichment, and violation of the Massachusetts unfair and deceptive trade practices statute, General Laws Chapter 93A § 11.   These claims arise from conduct apparently orchestrated by or known to the highest executive management levels of Pure Storage.    In addition, various Pure Storage Board of Directors members and significant early investors are former executives of EMC or its subsidiary, VMware, Inc., who have intimate and confidential knowledge of EMC's business and EMC's best-in-class sales and engineering organizations.  For example, Pure Storage Board of Directors member Frank Slootman is the former President of Data Domain and, after its acquisition by EMC, was President of EMC's  remarkably successful Backup Recovery Systems Division ("BRS").   On information and belief, Mr. Slootman has been actively involved for Pure Storage in the identification and/or recruitment of highly skilled EMC employees.

4.     EMC competes vigorously and lawfully in the marketplace and expects – indeed, embraces – the same conduct from its competitors.   Unfortunately, rather than attempt to compete legitimately with EMC, Pure Storage has improperly obtained and benefited from critically sensitive EMC Confidential Information from former EMC employees in order to (i) target and raid with unnatural precision a collection of EMC's highest achieving technical and sales professionals, (ii) assign former EMC employees to unlawfully interfere with EMC's customer relationships, with prior knowledge that such actions violate the terms of Key Employee Agreements ("KEAs") between EMC and its former employees, and (iii) use for its

own benefit EMC's Confidential Information as Pure Storage seeks to sell competing products in the enterprise storage marketplace.

5.     Since August 2011, at least forty-four of EMC's highly valued technical engineers and sales professionals have left EMC under suspicious circumstances and joined Pure Storage. These talented former EMC employees, who apparently now comprise over 50% of Pure Storage's entire sales force, possess confidential knowledge and information about EMC's technologically superior storage systems and the particular implementations of those systems at some of EMC's most strategically valuable customers.   In many instances, these individuals were among the highest performing EMC professionals in their positions in either the entire nation or in their assigned regions.   Legitimate hiring in the open market would not result in such overwhelming recruitment of high-achieving employees from a single company.

6.     Pursuant to their KEAs, nearly all of these employees has (or had) contractual obligations to EMC.   These contractual obligations include: (a) not to use, divulge or disclose to persons outside of EMC its confidential and proprietary business information concerning EMC and its customers ("Confidential Information"), (b) to return all EMC materials as described in the KEA (collectively with Confidential Information, "EMC Property") upon leaving EMC, (c) for a proscribed period, not to solicit business from any EMC customer or potential customer, and (d) for a proscribed period, not to solicit EMC employees to end their employment with EMC.

7.     Pure Storage is well aware of these legal obligations.   Numerous high-ranking Pure Storage managers are former EMC employees and are themselves parties to KEAs with EMC.   Moreover, Pure Storage's CEO, Scott Dietzen, has received correspondence from EMC on at least twenty-seven separate occasions expressly notifying him of the ongoing obligations

owed to EMC by its former employees, and the sensitivity of the EMC Confidential Information they are prohibited from disclosing. Notwithstanding these notices to the company's senior-most executive, Pure Storage has continued to hire former EMC employees who have misappropriated valuable EMC Property and has induced these employees to solicit other key EMC technical engineers and sales representatives and strategically important EMC customers – all in violation of their KEAs. In certain instances, Pure Storage has participated directly with the former EMC employees to violate their legal obligations to EMC. For example, in February 2013 – only six days after Pure Storage's CEO received express written notice of the obligations owed to EMC by former employee Frank Nunley – Pure Storage's number two executive, President David Hatfield, used Nunley to solicit a then-current EMC employee regarding the benefits of working for Pure Storage at a lunch meeting and tour of Pure Storage's offices. Days later the solicited employee resigned from EMC to work for Pure Storage.

8.      EMC has attempted various measures to stop Pure Storage's persistent and systematic pattern of illegal conduct. EMC wrote notices to the former EMC employees and to Pure Storage reminding each of the ongoing KEA obligations owed to EMC. EMC also sent cease and desist letters to numerous former EMC employees and to Pure Storage.

9.      Notwithstanding these express warnings, several former EMC employees now with Pure Storage are known to have taken EMC's competitively sensitive Confidential Information, and to have improperly used that information while employed by Pure Storage – including by commingling EMC's Confidential Information with Pure Storage information. As set forth herein, the former EMC employees are known to have engaged in other affirmative acts of misconduct in direct violation of their legal obligations to EMC. Certain of these activities

were undertaken under the supervision – if not the direction – of Pure Storage President, David Hatfield, Pure Storage Regional Sales Manager Jeffrey LaCamera, and others.

10.    EMC has initiated litigation against not fewer than six of its former employees, and obtained injunctions or Court Orders requiring various of those employees to return misappropriated confidential and proprietary EMC Property.  *See EMC Corporation v. Cruey et al.*, Suffolk Superior Court, Civil Action No. 13-0843-C (granting preliminary injunction); *EMC Corporation v. Tanner*, U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-11386-WGY (voluntarily dismissed pursuant to settlement agreement); *EMC Corporation v. Cochran*, U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-12380-PBS (Court-Ordered return of EMC materials; Stipulated Order entered); *EMC Corporation v. Johnson*, U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-12639-RWZ (injunction motion pending).   In numerous instances, these former employees returned misappropriated EMC materials only after EMC was compelled to initiate litigation – and in several instances only pursuant to Court direction.

11.    Because Pure Storage's unlawful activity has continued unabated despite EMC's prior efforts, EMC brings this action seeking relief that will finally put to a stop the underhanded conduct being orchestrated by Pure Storage and its executives, and to seek full redress for the harm this conduct has caused EMC.

## **PARTIES**

12.    Plaintiff EMC is a Massachusetts corporation with its principal executive offices in Hopkinton, Massachusetts.  EMC is a worldwide leader in the manufacture and sale of mass computer storage systems and related software and services.  These systems are used for storage and retrieval of large volumes of data and files of corporations and other large organizations.

EMC pioneered the development of storage systems and related software known as "enterprise storage products," which store and permit retrieval of massive amounts of digital information.

13.     On information and belief, Defendant Pure Storage is a Delaware corporation with its principal place of business at 650 Castro Street, Suite 400, Mountain View, California. Pure Storage is a competitor to EMC, and is engaged in designing, developing, making, using, selling, and offering for sale enterprise storage products.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between EMC and Pure Storage, and the amount presently in controversy exceeds $75,000, exclusive of interests and costs.

15.     This Court has personal jurisdiction over Pure Storage because, among other things, Pure Storage transacts business in this district, including by employing sales managers within this district, by attempting to solicit customers in this district and by giving presentations to customers about its products in this district.  EMC is aware of numerous Massachusetts-based customers and/or potential customers for which EMC and Pure Storage are in direct competition to win enterprise storage business.   In addition, the actions complained of herein are causing injury to EMC in this district.

16.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) because Pure Storage transacts business in this district and is subject to this Court's personal jurisdiction with respect to this civil action.

## FACTUAL BACKGROUND

### *EMC Is in a Highly Competitive Industry*

17.     EMC is one of the leading technology companies in the world.  EMC is engaged in, among other things, the business of designing, manufacturing and selling technologies and information storage systems for managing information in complex technical environments.

18.     EMC competes with many companies in the markets that it serves, and its products have achieved broad market acceptance due in large part to their technological superiority to competing offerings and the team of skilled EMC sales professionals and technical consultants who effectively market and sell these products to EMC's customers.  In order to maintain this competitive advantage, EMC expends substantial resources to safeguard and protect its Confidential Information, to develop and solidify its relationships with customers and potential customers and to retain, train and compensate its skilled employees.

19.     One of the significant markets in which EMC competes is the enterprise storage market.  Enterprise storage refers to the market for computer data storage designed for large-scale high-technology environments.

20.     The enterprise storage market is intensely competitive, particularly with respect to pricing, which significantly impacts the development and sustainability of customer relationships.  The unique sales process for enterprise storage solutions requires that pricing and terms be negotiated on a customer-by-customer basis.  As a consequence of their employment with EMC, sales representatives and technical consultants develop strong relationships with customers, on behalf of EMC, and develop critically sensitive pricing solutions and strategies custom tailored for each individual customer.  EMC's solutions often include ongoing consultation, maintenance, and support services.

21.     EMC has established the leading reputation in the enterprise storage market and has developed critically valuable relationships with its enterprise storage customers.   EMC devotes substantial resources and has made significant investments in developing client relationships and goodwill among its customers by supporting the activities of EMC's sales force and technical consultants and by making expenditures on hiring and recruiting talent, sales and technical training, trade shows and education.

22.     In addition, EMC takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its trade secrets and Confidential Information, including, but not limited to, requiring its employees to sign KEAs, requiring its customers, partners and vendors to sign non-disclosure agreements, password protecting its computer systems and employing various physical security measures at all of its facilities. Moreover, EMC adopts and enforces several written policies that are designed to protect its Confidential Information and trade secrets, including following the concept of "need-to-know," pursuant to which employees are only provided the minimum access to Confidential Information needed to perform their assigned duties.

### *EMC Requires Employees to Sign Key Employee Agreements*

23.     To protect EMC's body of patentable, trade secret, and Confidential Information, and to protect its valuable customer relationships, EMC requires employees to enter into KEAs at the commencement of their employment with EMC.  The KEAs expressly state that they are entered into as (a) a condition of, and in consideration for, employment with EMC, and (b) "[i]n view of the highly competitive nature of the business of [EMC], the need of [EMC] to maintain its competitive position through the protection of its goodwill, trade secrets and confidential and proprietary information, and in consideration for being provided with access to certain trade

secrets and/or confidential and proprietary information in conjunction with employment with [EMC]." *See, e.g.,* Ex. A.

24.    Since August 2011, the following U.S.-based former EMC employees (collectively, the "Former Employees") have terminated their employment with EMC to join Pure Storage:

| Name | Position/Business Unit | Location |
|------|------------------------|----------|
| Ahrens, Michael | Sr. Manager, Commodity/Supply Chain | Santa Clara, CA |
| Cardin, Carol | Account Manager | Boise, ID |
| Chapman, Craig | Sr. Systems Engineer | Tampa, FL |
| Chudzik, Michael | Principal Tech Consultant | Chicago, IL |
| Clay, Phil | Account Manager, Mid Market | Bellevue, WA |
| Cochran, Ricky Shane | Account Manager, Mid Market | Dallas, TX |
| Cruey, John | Sr. Account Manager, Mid Market | Pleasanton, CA |
| Danz, William | Sr. Mgr., Regional Partner | Chicago, IL |
| Dodson, Jacob | Sr. Manager, Mid Market Sales | Austin, TX |
| Degnan, Nick | Manager, Territory Partner | Santa Clara, CA |
| Fowler, Amy | Manager, Verticals | Portland, OR |
| Fredrickson, Justin | Manager, Systems Engineer | Santa Clara, CA |
| Gutowski, Joseph Jr. | Director, Mid Market Sales | Dallas, TX |
| Irwin, Jonas | Principal Systems Engineer | Pleasanton, CA |
| Johnson, Chad | Manager, Partner Sales | Austin, TX |
| Kenney, Chadd | Manager, Tech Consultant | San Francisco, CA |
| Kline, Joshua | Account Manager, Enterprise | Indianapolis, IN |

| Name | Position/Business Unit | Location |
|---|---|---|
| LaCamera, Jeffrey | District Sales Manager 2 | Chicago, IL |
| LeSage, Andrew | Director, Systems Engineer | Centennial, CO |
| McKenna, William | Sr. Manager, Enterprise | New York, NY |
| Monagan, Robert | Account Manager, Mid Market | San Diego, CA |
| Nunley, Frank | Account Manager, Mid Market | San Francisco, CA |
| O'Harrow, Wade | Sr. Director, Systems Engineer | Duluth, GA |
| Owings, Jon | Sr. Systems Engineer | Duluth, GA |
| O'Shea, Brian | Commercial District Manager 3 | Santa Clara, CA |
| Simays, Adrian | Sr. Manager, Practice | Pleasanton, CA |
| Skogsberg, Aaron | Sr. Adv. Solutions Principal | Charlotte, NC |
| Stine, John | Advisory Systems Engineer | Indianapolis, IN |
| Tanner, Jonathan | Account Manager, Mid Market | Chicago, IL |
| Thompson, John | Account Manager, Mid Market | Duluth, GA |
| Way, Robert | Sr. Systems Engineer | Berkeley Heights, NJ |
| Williams, Shayne | Advisory Systems Engineer | Bellevue, WA |

During the previous two months alone, eleven of these Former Employees left EMC to join Pure Storage.

25.     In addition, at least ten other EMC employees who were internationally based have terminated their employment with EMC to join Pure Storage since on or about April 14, 2012.

26.     Virtually all of these employees entered into a KEA with EMC, pursuant to which they owe various (and sometimes modestly different) obligations to EMC.  Although the specific obligations owed to EMC by the Former Employees vary slightly depending on factors such as their tenure with EMC or their geographical region, in general, the Former Employees executed KEAs with substantively similar provisions. For example, nearly all of the Former Employees entered into KEAs that require them, upon termination of their employment with EMC, (a) not to use, divulge or disclose to third parties, EMC's Confidential Information, (b) to return all EMC Property in their possession, custody or control, and (c) for a period of one year after the termination of their employment with EMC, (i) not to solicit business from any EMC customer or potential customer and (ii) not to solicit EMC employees to end their employment with EMC. The Former Employees who have been sued by EMC for violating their KEAs – including Ricky Cochran ("Cochran"), John Cruey ("Cruey"), Chadwick Johnson ("Johnson"), Frank H. Nunley ("Nunley"), Brian O'Shea ("O'Shea"), and Jonathan Tanner ("Tanner") – each executed a KEA with provisions substantively similar to the provisions quoted below.

27.     Nearly all of the Former Employees agreed to the following one-year employee and customer non-solicitation provision (or a substantively similar version):

> **Non-Solicitation**.  During your employment and for the twelve month period following the effective date of your termination, for any reason, from [EMC], you agree that you will not, either on your own behalf or on behalf of any person or entity, directly or indirectly: (i) solicit, or attempt to solicit, any person who is an employee, consultant or contractor of the Company to terminate, alter or modify such person's employment relationship with the Company; or (ii) solicit, or attempt to solicit, the business of any person or entity that is either a customer or a potential customer of [EMC], to which you, directly or indirectly, attempted to or did, sell or provide any product or service on behalf of EMC, or about which you obtained any Confidential Information, during the two year period prior to your last day of active employment.

28.     The Former Employees also agreed to substantively similar confidentiality provisions, pursuant to which they agreed not to use, divulge or disclose to persons outside of EMC any Confidential Information, and to keep all non-public EMC materials and information confidential.  The following is one such example of a confidentiality provision set forth in the KEAs:

> **Confidentiality of Company Materials**.  You agree that both during your employment with [EMC] and thereafter you will not use for your own benefit or for the benefit of any other person or entity, divulge or disclose to anyone except to persons within [EMC] whose positions require them to know it, any information not already lawfully available to the public concerning [EMC] or any information constituting a trade secret ("Confidential Information").  Confidential Information also includes, without limitation, any technical data, design, pattern, formula, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised or existing product; any business, marketing, financial, or sales order; and the present or future business or products of [EMC]; any information regarding employees including contact information, employee lists, organization charts, information concerning particular employee skill sets, technical and business knowledge, and compensation, and any information concerning the particular needs of clients or customers and their buying patterns, price sensitivities, key decision makers (and the contact information for such individuals), product needs, product specifications, request for proposals and the responses thereto.

29.     Likewise, the Former Employees acknowledged that information about EMC's customers, partners and vendors is confidential, and agreed not to use or disclose it:

> **Customer, Partner and Vendor Confidentiality**.  You recognize that it is essential to [EMC's] success that all nonpublic customer, partner and vendor information is deemed to be confidential and is properly treated as a confidential trade secret.  Therefore, you agree not to use or disclose any such customer, partner or vendor information except as may be necessary in the normal conduct of [EMC's] business for the specific customer, partner or vendor, and at the end of your employment with [EMC], you will return to [EMC] any materials containing such information.

30.    The Former Employees further agreed that, upon termination from EMC, they would return to EMC all EMC Property:

> **Return of Company Materials**.  Upon your last date of active employment, for any reason, from [EMC], you agree to return immediately to [EMC] all [EMC] materials, which include but are not limited to all documents in any tangible or electronic form and all property, in your possession, custody or control relating to work done for [EMC] or relating to the processes and materials of [EMC], as well as all materials concerning past, present and future or potential EMC clients, customers, products and/or services. Such materials include, but are not limited to, customer and/or vendor lists, customer and/or vendor prospect material, financial projections, pricing or other sales-related data, rate structures, all technical materials, presentation materials, and software owned or developed by [EMC] for any purpose in any form.  You also agree to return to [EMC] all materials provided by customers of [EMC] and all teaching materials provided by [EMC].

31.    By signing their KEAs, the Former Employees agreed that (a) "the terms of [the KEA] are reasonable and properly required for the adequate protection of [EMC's] legitimate business interests," and (b) "any breach of [the KEA] will cause immediate and irreparable harm to [EMC] not compensable by monetary damages and that [EMC] will be entitled to obtain injunctive relief . . . to enforce the terms of [the KEA], without having to prove or show any actual damage to [EMC]."

32.    The KEAs also advised the Former Employees (and Pure Storage) that (a) EMC could commence a court action against the employee in Massachusetts seeking injunctive and declaratory relief for violation of the KEA, (b) the appropriate venue for such action is "in the state and/or federal courts located in Massachusetts," and (c) the KEA "shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the doctrine of conflicts of law."

33.     Each of the Former Employees terminated their employment with EMC between August 2011 and November 1, 2013 and began working for Pure Storage.

34.     Following their termination of employment with EMC, EMC provided most of the Former Employees with a letter reminding them of their continuing legal obligations to EMC.  Those letters stated (in substantively similar terms):

> During your employment at EMC Corporation ("EMC" or the "Company"), you signed a document titled "Key Employee Agreement" (the "Agreement").  A copy of this Agreement and your electronic affirmation. . . are attached hereto.  This letter is written to remind you that your Agreement remains in full force and effect after the termination of your employment with the Company.
>
> Under your Agreement with EMC, you remain obligated to refrain from competition with EMC in certain circumstances, to maintain EMC's confidential information, to respect EMC's customer relationships, to refrain from soliciting EMC's employees and customers and to return EMC's Company Materials, including all EMC information and documents.  This reminder is also being sent to your new employer.  EMC urges you to honor these obligations. Should you violate your obligations, EMC advises you that it will pursue all available legal remedies.

35.     Pure Storage received copies of each of these letters, addressed directly to its CEO, Scott Dietzen.

36.     In addition to these notices, certain Former Employees also received cease and desist letters from EMC as a result of their suspected involvement in soliciting other EMC employees to terminate employment with EMC and join Pure Storage and/or soliciting EMC customers in violation of their legal obligations to EMC.  Pure Storage's CEO received copies of each of these letters as well.

37.     Despite EMC's requests to cease this behavior, Pure Storage has continued to raid EMC's industry-leading professional talent in an attempt to jumpstart its competing business in

the enterprise storage arena, targeting EMC's high-performing employees and appropriating EMC's hard work, investment and good-will for Pure Storage's own benefit. As described below, Pure Storage directed, and provided assistance to, former EMC employee Frank Nunley, and on information and belief, other Former Employees, in connection with their unlawful conduct, including violating their KEAs by soliciting talented EMC employees to resign and join Pure Storage, improperly soliciting EMC customers, and retaining and using EMC Property. Pure Storage ratified and/or agreed to accept the benefits of the unlawful conduct of each of the former EMC employees now working for Pure Storage.

38.     EMC has taken several measures designed to stop the pattern of unlawful activities engaged in by Pure Storage and numerous Former Employees, including (a) sending written notices reminding Pure Storage and the Former Employees of the KEA obligations, (b) sending cease and desist letters to Former Employees and to Pure Storage when it learned of misconduct, and (c) in the most egregious cases, initiating litigation against numerous Former Employees seeking (and obtaining) injunctive relief and court orders and notifying Pure Storage of those lawsuits. Notwithstanding these measures, the systematic pattern of unlawful conduct by Pure Storage continues. The only legitimate conclusion is that these unlawful activities are being directed and endorsed by Pure Storage at the highest levels of the organization.

### Pure Storage Is A Direct Competitor to EMC and has Engaged in Predatory and Unlawful Solicitation of EMC's Employees

39.     EMC and Pure Storage are commercial rivals and compete directly in the enterprise storage market. Prior to August 2011, when EMC employees began leaving EMC in unusually rapid succession, Pure Storage was an insignificant competitor to EMC in the enterprise storage market. As a result of the conduct complained of herein, Pure Storage is suddenly (and unfairly) competing with EMC for business across the country – particularly in

certain critical accounts formerly managed by Former Employees currently working for Pure Storage. Pure Storage's website has numerous references identifying EMC as Pure Storage's "primary competitor" in the enterprise storage marketplace, including numerous statements from Pure Storage's CEO describing EMC as a direct competitor.

40.     Pure Storage is unabashedly focused on EMC.   In a recent article from The Register titled "Pure Storage Plots to Kill EMC VMAX", Pure Storage President David Hatfield plainly asserts "[w]e are going after VMAX."   Simon Sharwood, The Register, Oct. 21, 2013, http://www.theregister.co.uk/2013/10/21/pure_storage_plots_to_kill_emc_vmax (quoting President David Hatfield).   Similarly, a recent Forbes article titled "Pure Storage Targets EMC, Streaks to IPO with $250 Million Capital Infusion," makes clear that EMC is Pure Storage's primary target.   The article, which includes liberal quotations from Pure Storage's CEO, Scott Dietzen, states:

> To be sure, Pure faces competition – including the big guys like EMC.  But Pure seems to be growing faster than the giant storage company. . . When I spoke with Dietzen again in August 2012, he said that Pure was growing at 250% a year and was on track for an IPO.  EMC – with $22 billion in revenues, grew at 8.5% in the last year.  But now Pure is growing even faster than in 2012.  Dietzen explained, "We are growing at 50% a quarter sequentially and started 2013 with over 125 people and expect to end the year with 325.
>
> Pure is using its channel partners to take share from EMC. . . "We tell the channels that they can sell to the EMC customers that it deals with [sic] via direct sales by selling Pure's product." Peter Cohan,       FORBES,       Aug.       29,       2013, http://www.forbes.com/sites/petercohan/2013/08/29/pure-storage-targets-emc-streaks-to-ipo-with-150-million-capital-infusion (quoting CEO Scott Dietzen).

41.     According to Dietzen, Pure Storage has expanded rapidly.   Instead of using fair and lawful competition to attract and retain talented employees, Pure Storage has implemented a

scheme to interfere with EMC's business relationships with its employees, and to encourage and induce current and former EMC employees to breach their duties to EMC.  On information and belief, Pure Storage is unlawfully using intimate knowledge of EMC's technical engineering and sales workforce to hire a core of key sales professionals and technical engineers in order to quickly staff Pure Storage's business with experienced, high-performing EMC employees.  By engaging in this scheme, Pure Storage is unlawfully appropriating for itself the business process, human resource talent, and goodwill that EMC built over decades.

42.     Pure Storage's apparent connection with EMC does not end with its desire to capture a portion of EMC's market-leading position in the industry.  Indeed, various members of Pure Storage's Board of Directors and significant early investors are former executives of EMC or its subsidiary, VMware – including Frank Slootman (former President of EMC's Backup Recovery Systems Division), Diane Greene (founder and former President and CEO of VMware), and Dr. Mendel Rosenblum (founder and former Chief Scientist of VMware) – who have intimate and confidential knowledge of EMC's business and EMC's best-in-class sales and engineering organization. Sixteen of the forty-four EMC employees recruited and hired by Pure Storage were employees in the EMC Backup Recovery Systems Division formerly headed by Slootman.

### Pure Storage's Unlawful Collusion with Former Employees to Induce them to Solicit EMC Employees

43.     Brian O'Shea ("O'Shea") was a Commercial District Manager employed by EMC until April 30, 2012.  Thereafter, he resigned from EMC to work for Pure Storage.

44.     As a Commercial District Manager, O'Shea was entrusted with information concerning EMC's confidential business plans, customer and partner lists, marketing strategies, product development, product offerings, pricing structures, solicitation methods and training

protocols.  Moreover, O'Shea had intimate knowledge of the unique skills and work experiences, specific areas of responsibility, compensation packages, and work performance of the EMC employees he managed or worked with.

45.     In the months following his resignation, O'Shea openly indicated that he intended to recruit EMC employees to join him in working for Pure Storage, going so far as to tell former colleagues that they "would be surprised" to find out which employees would soon be leaving EMC to join Pure Storage.

46.     Shortly after O'Shea's resignation from EMC, at least the following eight EMC employees with direct connections to O'Shea departed EMC to work for Pure Storage:

| Name | Departure Date |
| --- | --- |
| Chadd Kenney ("Kenney") | August 10, 2012 |
| Jonathan Tanner ("Tanner") | December 21, 2012 |
| Robert Monagan ("Monagan") | January 2, 2013 |
| Nicholas Degnan ("Degnan") | January 7, 2013 |
| Frank Nunley ("Nunley") | January 25, 2013 |
| Phillip Clay ("Clay") | February 7, 2013 |
| John Cruey ("Cruey") | March 5, 2013 |
| Jonas Irwin ("Irwin") | March 5, 2013 |

47.     Each of these former EMC employees (a) now work for Pure Storage in sales and/or technical consulting positions, and (b) had direct professional relationships with, or strong personal ties to, O'Shea in that they were recruited by O'Shea to come to EMC, reported to him while at EMC and/or worked closely with him at EMC.

48.     In August 2012, Kenney informed EMC that he was resigning from EMC to work for Pure Storage.  Kenney told EMC that a key reason for departing EMC and joining Pure Storage was O'Shea, who had left EMC three months earlier.

49.     On August 27, 2012, an attorney from EMC's Office of the General Counsel sent O'Shea a letter (bearing the address of EMC's headquarters in Massachusetts) citing Kenney's departure from EMC and reminding O'Shea of his continuing obligations under his KEA, including to refrain from directly or indirectly recruiting, soliciting or inducing, or attempting to recruit, solicit or induce EMC employees to alter their employment relationships with EMC.  A copy of EMC's letter was also delivered to Pure Storage's CEO, Scott Dietzen.

50.     Despite EMC's written notice to O'Shea and Pure Storage, at least seven more high performing EMC employees – Tanner, Monagan, Degnan, Nunley, Clay, Cruey and Irwin – each of whom worked closely with or under O'Shea at EMC, thereafter left EMC to work for Pure Storage with O'Shea. On information and belief, O'Shea and Pure Storage engaged in a calculated plan to target and harvest the most valuable employees formerly associated with O'Shea at EMC.  The speed and precision with which Pure Storage was able to raid O'Shea's former group at EMC is compelling evidence that Pure Storage used Confidential Information to recruit the top performers, and actively participated in and induced O'Shea's violations of his employee non-solicitation provision.   Indeed, Pure Storage benefited from O'Shea's KEA violations by having the means to efficiently hire highly skilled employees – with critically valuable information about, and relationships with, EMC's customers – without the level of effort that would, absent the misconduct in this case, be possible.

51.     Notwithstanding Pure Storage's knowledge of O'Shea's contractual obligations to EMC, Pure Storage, on information and belief, assisted O'Shea and induced O'Shea to breach

his KEA by soliciting EMC employees to join him at Pure Storage.  On information and belief, Pure Storage colluded with and provided assistance to other Former Employees in connection with their unlawful actions in violation of their KEAs, and ratified and agreed to accept the benefits of that conduct.

52.     The only reasonable inference to be drawn from the particular employees who resigned from EMC to join Pure Storage – even after O'Shea and Pure Storage's CEO received EMC's written notices – is that Pure Storage directed O'Shea to recruit the most talented of his former colleagues at EMC to join Pure Storage.  The evidence shows that O'Shea followed that direction.  For example, Clay worked directly for O'Shea at EMC.  When Clay departed EMC to work for Pure Storage, he stated that O'Shea had spoken to him about working for Pure Storage.  Likewise, Irwin was a principal technical consultant for EMC who had been the architect supporting many of Nunley's largest sales deals at EMC.  On or about Friday, February 8, 2013, O'Shea met with Irwin in person.  Irwin resigned from EMC to work for Pure Storage less than one month later, on March 5, 2013.

53.     On information and belief, O'Shea was not the only former EMC employee that the most senior executives of Pure Storage encouraged to solicit EMC employees in violation of the KEA.  In a brazen example of Pure Storage's disregard for the contractual obligations owed to EMC by its former employees, the President of Pure Storage, David Hatfield ("Hatfield"), intentionally and purposefully colluded with Nunley to recruit an EMC employee named John Cruey.

54.     On or about Wednesday, February 27, 2013, Hatfield orchestrated a lunch meeting between Hatfield, Nunley, and then EMC employee Cruey.  Cruey told EMC that an employment opportunity with Pure Storage was presented to him at the lunch meeting and that,

after lunch, Nunley and Hatfield brought Cruey to Pure Storage to show him the company's offices and to pitch him further regarding the corporate culture and benefits of working for Pure Storage. Days later, on March 4, 2013, Cruey notified EMC that he was resigning from EMC to work for Pure Storage in a position reporting directly to O'Shea.

55.     At the time of the February 27, 2013, unlawful recruitment meeting, Nunley and Pure Storage were fully aware of Nunley's ongoing employee non-solicitation obligations to EMC. Indeed, only six days earlier, on February 21, 2013, an attorney from EMC's Office of the General Counsel sent Nunley a letter (bearing the address of EMC's headquarters in Massachusetts) reminding him of his continuing obligations under his KEA, *including to refrain from soliciting EMC's employees* and to return all EMC Property. The letter also advised Nunley that EMC would take appropriate legal action if Nunley used or disclosed EMC's Confidential Information and trade secrets. A copy of EMC's letter was delivered directly to Pure Storage's CEO. Notwithstanding Pure Storage's direct knowledge of Nunley's contractual obligations to EMC, the President of Pure Storage utilized Nunley and induced him to breach his KEA a mere six days after receiving EMC's letter.

56.     When viewed in the proper context, Pure Storage's motive is clear. By using Nunley to recruit his former EMC colleagues, and thereby reuniting Cruey with O'Shea and Nunley at Pure Storage, Pure Storage gained a deeply experienced team that had both a track record of demonstrated success, and deep knowledge of proprietary strategies and competitively sensitive Confidential Information of the leader in the enterprise storage industry – EMC. Through Pure Storage's employment of O'Shea and Nunley, Pure Storage knew that Cruey, Nunley, and O'Shea worked closely together at EMC, and that each ranked among the very top performers in the entire country for EMC. While Cruey worked at EMC, Nunley was Cruey's

sales partner and O'Shea was responsible for managing Cruey.  It was in Pure Storage's interest to reunite this successful team at Pure Storage and the most effective means for accomplishing this objective was to use the former EMC employees (and their relationships) as assets to recruit additional high valued employees away from EMC.

57.     On information and belief, Pure Storage directed O'Shea to recruit Nunley, and colluded with Nunley and O'Shea to recruit Cruey and other former EMC employees.   On information and belief, Pure Storage induced additional KEA violations, by using Former Employees to solicit EMC employees to join Pure Storage.

58.     As explained below, numerous Former Employees (including Cochran, Johnson, Cruey, Nunley, and O'Shea) misappropriated EMC Confidential Information and Property when they left EMC and joined Pure Storage.   On information and belief, Pure Storage used and benefitted from Confidential Information known by Nunley and O'Shea and other former EMC employees to target EMC's high-performing employees, and have directly or indirectly recruited, solicited and/or induced, EMC employees to terminate their employment with EMC and join Pure Storage, thereby taking EMC's hard work and investment for Pure Storage's benefit - all in violation of their KEAs with EMC.   On information and belief, Pure Storage is continuing to unlawfully induce EMC's former employees to solicit current EMC employees to work for Pure Storage.   Indeed, as of the filing of this Complaint, since September 1, 2013, not fewer than sixteen EMC employees have left EMC to join Pure Storage.

59.     By assisting and directing the Former Employees' solicitation and recruitment of individuals employed by EMC, Pure Storage induced at least O'Shea and Nunley to breach their respective KEAs and deprived EMC of the value of its investment in these important employees.

*The Former Employees Misappropriated Volumes of EMC Confidential Information so that they Could Use it at Pure Storage to the Detriment of EMC*

60.     It has been established through separate litigation that various Former Employees misappropriated EMC Confidential Information and Property when they joined Pure Storage, including Cochran, Cruey, Johnson, Nunley, and O'Shea.  The information misappropriated by the Former Employees is highly confidential and proprietary to EMC, and would be useful for an EMC competitor such as Pure Storage.  On information and belief, by unlawfully bringing EMC's trade secrets and confidential and proprietary information to Pure Storage, the Former Employees acted in concert with Pure Storage to further its plan to get ahead in the enterprise storage market by unlawfully using EMC's hard work and investment.

61.     The materials that the Former Employees stole from EMC are extensive.  And, as explained below, there is evidence that EMC Confidential Information has been commingled with Pure Storage information after the Former Employees joined Pure Storage.

62.     On March 4, 2013 – the day he resigned from EMC – Cruey surreptitiously used his EMC email account to send himself, at his personal "Gmail" account (johncruey@gmail.com), an Excel spreadsheet (the "Cruey List") containing the first and last names, company names, business and cell phone numbers and email addresses for more than 1,700 individuals, including key decision makers at customers and/or potential customers of EMC, suppliers and/or partners of EMC and employees of EMC.  Among other things, the Cruey List contains contact information for key decision makers at a majority of Cruey's "install base" customers, e.g., customers who purchased products and services from EMC during Cruey's tenure with EMC.  Cruey misappropriated, and failed to return to EMC, the Cruey List.

63.     Similarly, on January 20, 2013 – five days before he left EMC – Nunley accessed a spreadsheet (the "Nunley List"), which was located on an external storage device, by inserting

the device into a printer.  The Nunley List contains information pertaining to more than 490 individuals, including EMC customers, employees and partners and/or suppliers.  Among other things, the Nunley List includes contact information for key decision makers at EMC customers that were part of Nunley's territory during the time that he worked at EMC.  Nunley failed to return the external storage device to EMC upon his termination and misappropriated, and failed to return to EMC, the Nunley List.

64.     The Cruey and Nunley Lists constitute EMC Property and trade secrets, and they are subject to the express terms of the KEA.  KEAs, ¶2 (customer, partner and vendor information is confidential), ¶ 3 (Confidential Information includes "customer, supplier or employee lists"), ¶ 6 ("customer and/or vendor lists" must be returned upon termination of employment).  As explained above, Cruey and Nunley agreed that (a) they "will not to use for [their] own benefit, divulge or disclose to anyone except to persons within EMC whose positions require them to know it" the Cruey and Nunley Lists, and (b) they would return the Cruey and Nunley Lists upon termination of their employment.

65.     The Cruey and Nunley Lists are valuable to EMC.  They were developed at EMC by Cruey and Nunley (and potentially other EMC employees) under the direction of EMC through years of effort as a necessary requirement – and a direct consequence – of their employment with EMC.  The Cruey and Nunley Lists contain not merely the names of enterprises that are active or potential purchasers of EMC's storage products and services, but also the identification of, and personal contact information for, key purchasing decision makers within those enterprises.  But for their employment with EMC, Cruey and Nunley would not have acquired, or gained access to, this information.

66.     The information contained in the Cruey and Nunley Lists is competitively sensitive, highly confidential, and owned by EMC.  It has independent economic value by virtue of not being known to EMC's competitors, including Pure Storage, who could obtain substantial economic value from its disclosure or use, including by using the list to unfairly compete with EMC and poach EMC's customers (and employees).

67.     For example, the misappropriated materials could have been used (and likely have been used) to identify and contact the decision makers inside EMC's customers and potential customers, and to directly target these key decision makers on behalf of Pure Storage – individuals whom Pure Storage would likely otherwise not have been aware were crucial to the sale of storage products and services that both EMC and Pure Storage market and sell in direct competition with each other.  Therefore, the Cruey and Nunley Lists could allow Pure Storage to unfairly compete with EMC, and to build and grow Pure Storage's competing business (using EMC's investment) more quickly and easily than they would have otherwise been able to do without using the Cruey and Nunley Lists.  This is among the precise conduct that the KEA prohibits and is intended to prevent – and exactly why Pure Storage's CEO was directly informed of the former EMC employees' legal obligations on or about the time of their departure from EMC.

68.     Cruey's and Nunley's failure to return the Lists after their employment with EMC and while employed by an EMC competitor, constitutes a violation of their KEAs, was beneficial to Pure Storage, and damaged EMC.

69.     In addition, upon termination of his employment at EMC, Cruey failed to return to EMC thousands of documents (including documents explicitly designated by EMC as "EMC

Confidential" and/or for "Internal Use Only") that he uploaded to a personal account he created with Syncplicity.com while still employed by EMC.

70.     Syncplicity is an internet-based service that allows users to store, synchronize and share files among multiple computers and mobile devices.  EMC acquired Syncplicity in May 2012.  After the acquisition, EMC initially rolled out approximately 100 trial accounts to a test group of EMC employees and thereafter made EMC "Managed Accounts" available to more than 3,000 of its employees.  Cruey did not avail himself of the opportunity to open an EMC Managed Account with Syncplicity.  Instead, on or around January 18, 2013, he opened a private "Business Account" with Syncplicity that is not managed by EMC and which was in Cruey's exclusive control.

71.     Cruey configured his Syncplicity account to synchronize 9 folders containing approximately 4,185 files between his EMC-owned laptop, an iPhone, and an iPad tablet computer.  The files Cruey uploaded to his private Syncplicity account include documents that are expressly designated as "EMC Confidential" and/or "EMC Internal Use Only," and which constitute EMC trade secrets.

72.     When Cruey terminated his employment with EMC, Cruey failed to return the EMC documents that he uploaded to Syncplicity, including the confidential and proprietary EMC documents.  In fact, Cruey connected one or more of his electronic devices to his Syncplicity account on March 14, 2013 – nearly 10 days after his termination from EMC.

73.     EMC brought suit in the Commonwealth of Massachusetts against Nunley and O'Shea on or about March 8, 2013, alleging that Nunley and O'Shea had breached their respective KEAs and the Implied Covenant of Good Faith and Fair Dealing.  Thereafter, EMC amended its complaint to add Cruey as a defendant and assert additional claims relating to

Cruey's KEA violations. On May 13, 2013, the Commonwealth of Massachusetts issued a preliminary injunction, finding that EMC has a reasonable likelihood of succeeding on the merits of its claims regarding the misappropriation of EMC Property in violation of the KEA, and ordering Cruey and Nunley to return to EMC the confidential and proprietary EMC documents described above.

74.     Several weeks after EMC filed its lawsuit, as a result of EMC's injunction motion, Cruey, Nunley and O'Shea disclosed that they possessed even further additional EMC Confidential Information and Property that they had misappropriated from EMC when they left to join Pure Storage.

75.     In particular, Nunley revealed that he had misappropriated volumes of EMC Property and Confidential information. Specifically, Nunley disclosed that he had misappropriated two spreadsheets labeled as "Underpenetrated" EMC accounts, each of which contains several pages of detailed contact information for key decision makers at customers and/or potential customers of EMC and notes relating to those accounts, including sales strategy information and action items. Even more disturbing to EMC is the fact that these spreadsheets were produced to EMC in redacted form because, as explained by Nunley's counsel: "information containing Pure Storage's customers has been redacted." In addition, Nunley had in his possession four thumb drives which, according to Nunley, "contain, among other things, presentations used for customer meetings and presentations [he] made to [his] supervisors on a quarterly basis concerning [his] sales activity." Some of these presentations were directed towards the highest ranked "underpenetrated" EMC accounts, including the accounts ranked first, fourth, sixth and eleventh. Other presentations clearly reflect EMC's strategic efforts to expand its market share, including information about EMC's efforts in healthcare analytics and

with electronic medical records.  Moreover, the thumb drives contain numerous technical and business meeting presentations, proposals, total cost of ownership analyses, data profile assessments and price quotes.  Nunley admitted that he used at least one of the presentations on the thumb drives while employed at Pure Storage.  Thus, Nunley misappropriated EMC's highly Confidential Information and then commingled it with Pure Storage's files after he joined Pure Storage.  In addition, Nunley failed to return six notebooks and several emails and attachments containing EMC Confidential Information that he had sent to his personal Gmail account prior to leaving EMC.

76.     Cruey was forced to concede that he too had sent to his personal Gmail account several emails and attachments containing EMC Confidential Information, including information relating to EMC's customer accounts and customer proposals.

77.     O'Shea revealed to EMC that he had also failed to return and misappropriated (1) a thumb drive containing an EMC PowerPoint presentation of a business plan and (2) two notebooks containing hundreds of pages of what O'Shea described as "notes from customer interactions and sales activities."

78.     There are additional Former Employees who misappropriated EMC Property just prior to joining Pure Storage, including Ricky Cochran.

79.      Cochran was employed by EMC as a Commercial Account Manager until April 19, 2013.  Thereafter, he went to work for the Pure Storage selling Pure Storage's directly competing products to the same class of customers to which he sold while at EMC.

80.     As a Commercial Account Manager, Cochran was responsible for selling to several of EMC's key strategic enterprise accounts.  Cochran was also entrusted with competitively sensitive business information developed and used by EMC, including confidential

business plans, customer and partner lists, marketing strategies, product development plans, product offerings, pricing structures, solicitation methods, sales strategies and other confidential and proprietary information that would be valuable to an EMC competitor such as Pure Storage. Cochran also acquired knowledge of ongoing and potential customer relationships and the key decision makers within those organizations, such as Chief Information Officers, Directors of Infrastructure and Purchasing Managers.

81.     On April 19, 2013 – the day he left EMC – Cochran sent to his personal email account a photograph which he had taken of an EMC PowerPoint slide (the "Cochran Slide") containing confidential, strategic EMC business information.  The Cochran Slide includes a list of thirty "underpenetrated" EMC customer accounts, along with EMC's plan for increasing sales of enterprise storage products to those accounts.  Cochran failed to return that Confidential Information to EMC upon his termination (that same day).

82.     In addition, Cochran sent to his personal email account various other documents containing confidential, strategic EMC business information ("Cochran Emails"), including information that is expressly designated as "EMC Confidential."  These documents include customer contact information, sales data, EMC product specifications, and EMC competitive selling guides, including documents specifically directed to EMC's flash products and strategies related to the implementation and sale of those products -- which compete most directly against Pure Storage's only product offering.  They, too, constitute EMC Property and are subject to the restrictions set forth in Cochran's KEA.  On information and belief, Cochran directed these materials to a private email account under his control in an effort to avoid detection by EMC. Cochran failed to return this EMC Property to EMC upon his termination from EMC.

83.     The information contained in the Cochran Slide and Emails is confidential, competitively sensitive, and owned by EMC.  It has independent economic value by virtue of not being known to EMC's competitors, including Pure Storage, who could obtain substantial economic value from its disclosure or use, including by using the information to unfairly compete with EMC and poach EMC's customers.

84.     Cochran's failure to return and, on information and belief, his use of the Slide and Emails after his employment with EMC and while employed by an EMC competitor, constitutes a violation of his KEA.

85.     On September 20, 2013, EMC filed a Verified Complaint and a motion for preliminary injunction seeking to enjoin Cochran from further use or disclosure of EMC's Property and further violations of his customer non-solicitation provision, as discussed below. Cochran removed the case to this district on September 26, 2013.  Thereafter, Cochran was forced to admit that he wrongfully possessed thousands of pages of additional EMC Property after the Court ordered Cochran to return EMC's materials to EMC and certify that he possessed no further such materials.

86.     An additional former EMC employee, Chadwick Johnson, was found to have unlawfully possessed thousands of pages of extraordinarily sensitive EMC documents and materials after he resigned from EMC and joined Pure Storage.  EMC initiated litigation against Johnson on October 18, 2013.  Johnson's last day at EMC's Austin, Texas office was September 18, 2013.  Through forensic analysis of Johnson's EMC-issued laptop ("Laptop"), EMC learned that on September 17th and 18th, 2013 – during the final 48 hours of his EMC employment – Johnson surreptitiously accessed several EMC files on his Laptop from external storage devices ("External Storage Devices") that he failed to return upon his termination from EMC.

87.     Among the files Johnson accessed on his EMC Laptop from the External Storage

Devices on September 17 and 18, 2013 were:

- *Registration Report on 09.xlsx*:  This EMC Registration Report contains in excess of 93,000 entries.  The Registration Report contains information that EMC salespersons are required to document in the EMC system when they work with a new customer or new EMC partner.   The Registration Report includes names, purchase histories, deal values, and other highly specific, confidential, and critical information about EMC customers.   This document is EMC Confidential Information.

- *PurevsXtremIObattlecard_9_9_2013(3).pdf*:    This EMC Competitive Selling Guide sets forth EMC's strategy for selling its XtremIO flash storage product against Pure Storage's FA Series products.  The Selling Guide includes information regarding the competitive advantages of EMC's XtremIO product, as well as highly sensitive, detailed explanations of EMC's head-to-head selling strategy.  This document is labeled "EMC CONFIDENTIAL."

- *Chad Johnson 2H 2013 Business Plan_template.pptx*:  This EMC Business Plan contains detailed data regarding EMC customer, partner, and employee relationships, as well as highly sensitive analysis of the competitive landscape and EMC's "Key Strategies" for growth in the enterprise storage market.  This document is labeled "EMC CONFIDENTIAL."

- *Fazende Q3 Channel Leverage Framework Review.pptx*:  This document includes extensive data and analysis regarding EMC's strategy for leveraging customer and partner relationships.   This document is labeled   "EMC CONFIDENTIAL."

88.     In addition, on September 17, 2013, Johnson printed a file named Fazende Q3-13

revenue Position 091713.xlsx.   This file is an Area Manager Report that includes detailed

confidential and sensitive information regarding EMC customers, specific products sold to those

customers, revenue generated, progress against goals, sales forecasts, and responsible sales

representatives.   This document, too, is EMC Confidential Information. Johnson did not return

this document upon his termination from EMC.

89.     The above-described materials ("Misappropriated Materials") constitute EMC Property and Confidential Information, and they are expressly subject to the restrictions set forth in Johnson's KEA.  KEA ¶ 2 (customer, partner, and vendor information is confidential); ¶ 3 (Confidential Information includes "any information concerning the particular needs of clients or customers and their buying patterns"); ¶ 6 ("all materials concerning past, present and future or potential EMC clients, customers, products and/or services" must be returned upon termination of employment).  As explained above, Johnson agreed that (a) he would "not use for [his] own benefit, divulge or disclose to anyone except to persons within [EMC] whose positions require them to know it" the Misappropriated Materials, and (b) he would return the Misappropriated Materials upon termination of his employment.  ¶¶ 3 and 6.

90.     The information contained in the Misappropriated Materials is confidential, competitively sensitive, and owned by EMC.  It has independent economic value by virtue of not being known to EMC's competitors, including Pure Storage, who could obtain substantial economic value from its disclosure or use, including by using the information to unfairly compete with EMC and poach EMC's customers.  As explained above, EMC takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of this and other Confidential Information. Johnson accessed the Misappropriated Materials on his final two days at EMC, when he had no legitimate business reason for doing so.  Moreover, each of the Misappropriated Materials resided on External Storage Devices as of the date that Johnson accessed them on his Laptop.  Because Johnson did not return these External Storage Devices upon his termination from EMC, EMC cannot identify the additional EMC files (and the amount thereof) that may reside on those devices.

91.     In addition to the above, on February 8, 2013, while still employed by EMC, Johnson created a "Free Subscription" account using his EMC email account at Syncplicity.com, the internet-based service (described above) to store, synchronize, and share files among computers and mobile devices.  Johnson configured this service to synchronize numerous folders containing hundreds of files between his EMC-owned laptop and Syncplicity's servers, including EMC Confidential Information.

92.     EMC's review of a report provided by Syncplicity indicates that Johnson accessed his Syncplicity.com account on September 23, 2013 – five days after his last day at EMC.

93.     Johnson's failure to return and, on information and belief, his use of the Misappropriated Materials after his employment with EMC and while employed by an EMC competitor, constitutes a violation of his KEA.

***Pure Storage's Unlawful Actions to Induce Former Employees to Solicit EMC Customers and Use EMC Confidential Information in Violation of their KEAs***

94.     On information and belief, Pure Storage is intentionally hiring high-performing employees from EMC and assigning them to solicit specified accounts so that the Former Employees can improperly use their confidential knowledge of ongoing and potential customer relationships, and knowledge of EMC's product technologies, capabilities and architecture, and its unique business processes, methods, pricing, methodologies and strategies to win business for their new employer, Pure Storage, at the expense of EMC.

95.     As detailed above, numerous Former Employees misappropriated volumes of highly proprietary EMC Confidential Information and EMC Property immediately prior to joining Pure Storage so that it would be available for use to win business for Pure Storage.  On information and belief, Pure Storage has used EMC Confidential Information to solicit business from EMC customers.

96.     For example, several of the Former Employees have violated their KEAs by soliciting customers on Pure Storage's behalf that they sold products to while at EMC and/or about which they obtained Confidential Information while at EMC.  On information and belief, Pure Storage is intentionally directing, encouraging, endorsing and permitting these Former Employees to use EMC Confidential Information to compete unfairly against EMC to win business for Pure Storage.

97.     For example, EMC has obtained information that O'Shea has successfully solicited the business of at least one strategic and valuable enterprise storage customer of EMC about whom O'Shea obtained Confidential Information during his final year at EMC – in violation of his KEA.   While at EMC, O'Shea obtained Confidential Information about the architecture and operations of this client's enterprise storage requirements, the architecture that EMC was proposing to sell to this customer and EMC's sales strategies related to this customer. On information and belief, O'Shea used this information and his specialized knowledge of the particular characteristics and performance of EMC's products, to undermine and compete unfairly against EMC to win substantial business on behalf of Pure Storage.  Following O'Shea's solicitation of this customer, this customer shifted its entire enterprise storage business from EMC to Pure Storage.

98.     On information and belief, another Former Employee named Jonathan Tanner also solicited EMC customers at Pure Storage's direction and under its endorsement, in violation of his KEA.  Tanner was employed by EMC as a commercial sales representative from February 16, 2004 until December 21, 2012. During his final years at EMC, Tanner was one of EMC's top commercial sales representatives, consistently ranking among the very top sales representatives in his region and among the top producers nationwide.  Tanner was also a "President's Club"

recipient during each of his final years at EMC, an honor awarded to EMC's top producers.  In his final four years at EMC alone, EMC paid Tanner in excess of $1 million.

99.    During his tenure with EMC, Tanner sold to several of EMC's key strategic enterprise accounts in the Chicago area.  As a commercial sales representative, Tanner was entrusted with competitively sensitive business information developed and used by EMC, including confidential business plans, customer and partner lists, marketing strategies, product development plans, product offerings, pricing structures, solicitation methods, sales strategies and other confidential and proprietary information that would be valuable to an EMC competitor such as Pure Storage. Tanner also acquired knowledge of ongoing and potential customer relationships and the key decision makers within those organizations.  EMC devotes significant resources towards developing and maintaining the secrecy of this information because it is a primary reason for EMC's success and its goodwill in the marketplace, including the goodwill it has earned from its customer relationships.

100.    As of December 21, 2012, the last day of Tanner's employment at EMC, EMC was unaware of even a single instance where EMC had competed against Pure Storage for any enterprise storage sale in Tanner's region.  Indeed, as of the date of Tanner's departure, Tanner's District Manager was generally unfamiliar with Pure Storage.  Almost immediately following Tanner's resignation, Pure Storage began competing directly with EMC for numerous Chicago-area enterprise storage accounts – including accounts which were assigned directly to Tanner during his employment with EMC.   Since then, EMC has learned that Tanner joined Pure Storage and became responsible for selling Pure Storage's directly competing products to the same class of customers that he sold to while at EMC.  Moreover, Tanner is one of only two Pure Storage sales representatives assigned to the Chicago region and to a few surrounding states.

EMC is now competing against Pure Storage in several EMC customer accounts that Tanner was responsible for selling to while at EMC.

101.   On or about June 4, 2013, EMC brought suit in the Commonwealth of Massachusetts against Tanner, alleging that Tanner had breached its KEA.  The case was subsequently removed to this district.  EMC alleged that Tanner was unlawfully soliciting at least two EMC customers that he personally sold EMC products to as an EMC employee.  Each customer is a longtime customer of EMC.  These companies were customers of EMC long before Tanner was assigned to cover these accounts.

102.   EMC asserted that Tanner directly solicited one of these EMC customers – a large global law firm with an office in Chicago – on behalf of Pure Storage.  During his tenure with EMC, Tanner was assigned to, and did, sell EMC products to this law firm.  In fact, in September 2010, he attended an executive briefing with the customer on EMC's behalf in Santa Clara, California.  Both the technical team at this law firm and one of EMC's partners confirmed that Tanner solicited this law firm for the express purpose of selling Pure Storage's products.

103.   In addition, EMC discovered that Tanner contacted at least one other EMC customer to which he previously sold EMC products as an EMC employee.  On May 8, 2013, while attending a sales conference called "EMC World" in Las Vegas, Nevada, an EMC systems engineer met with the Director of Infrastructure for a large privately-held global financial services firm (and EMC customer) headquartered in Chicago and New York.  The systems engineer worked closely with Tanner during Tanner's final years at EMC, including in customizing and selling EMC products to this same financial services firm.  Tanner had also attended an executive briefing with this global financial services firm in Santa Clara, California in September 2011.

104.     During the May 8, 2013 meeting with the customer, the EMC systems engineer observed a recent email that had been sent by Tanner (at Pure Storage) to the Director of Infrastructure, who confirmed that Tanner had contacted him on behalf of Pure Storage.   The Director of Infrastructure also confirmed that Pure Storage had contacted the New York-based Purchasing Manager of this EMC customer, with whom Tanner had a direct relationship as a result of his employment with EMC.

105.     On information and belief, at Pure Storage's direction and under its supervision, Tanner solicited various additional EMC customers in violation of his KEA, including (1) a financial technology and trading firm with a US office located in Chicago, and (2) another Chicago-based company that provides portfolio, practice management and reporting solutions to financial advisors and institutions.  Each of these customers is a long-time EMC customer that purchased EMC products from Tanner while he was still employed by EMC.  Indeed, Tanner attended executive briefings with each of the customers in July 2010 (at EMC Headquarters in Hopkinton, Massachusetts) and November 2011 (in Santa Clara, California).   EMC is now competing against Pure Storage for the sale of products and services to these two EMC customers.  On information and belief, Pure Storage also continues to use EMC's Confidential Information to efficiently target companies and compete against EMC to win business in a manner that would otherwise require months or years of investment and effort.

106.     Ultimately, EMC resolved its dispute against Tanner, voluntarily dismissing the litigation pursuant to a settlement agreement, under which Tanner re-affirmed his obligation not to solicit several EMC customers. That resolution did not involve Pure Storage, and did not address Pure Storage's inducement of Tanner to violate his legal obligations to EMC, or the

unlawful benefit to Pure Storage from its involvement with Tanner and Tanner's use of EMC's Confidential Information.

107.    In addition to O'Shea and Tanner, EMC learned that Cochran solicited EMC customers by marketing Pure Storage's directly competing products to the same customers to which he sold EMC products while at EMC.  Cochran is one of only two or three Pure Storage sales representatives assigned to the Dallas region.  EMC is now competing against Pure Storage in several EMC customer accounts to which Cochran was responsible for selling while at EMC. Prior to Cochran's employment with Pure Storage, EMC was not aware of any relationship between Pure Storage and the EMC customers formerly assigned to Cochran in the Dallas region.  Pure Storage is aware of Cochran's ongoing legal obligations to EMC, including the obligations owed by Cochran to EMC pursuant to his KEA.  On April 23, 2013, EMC wrote to Cochran reminding him of these continuing legal obligations.  Pure Storage's CEO, Scott Dietzen, was copied on that letter.  Cochran engaged in the unlawful activities set forth above with the knowledge of, and, on information and belief, under the specific direction of, Pure Storage.  Moreover, on information and belief, Pure Storage ratified or agreed to accept the benefits of the unlawful conduct of Cochran.

108.    EMC has recently learned that Cochran unlawfully solicited EMC customers to which he sold products or about which he gained Confidential Information during his final two years at EMC, and that Pure Storage is soliciting customers about which Cochran has unlawfully retained sensitive information and EMC Property.  These customers are longtime customers of EMC. These companies were customers of EMC long before Cochran became an EMC employee.

109.    EMC has confirmed that Cochran directly solicited a key EMC customer – in fact, the largest customer account in his former EMC district.  The customer is a global commercial real estate firm with offices in Dallas.  On or about August 21, 2013, at a training session on an EMC product in Dallas, an EMC Commercial Account Manager met with one of this customer's IT employees.  Cochran had obtained this IT employee's contact information during his tenure at EMC, and had been privy to extensive Confidential Information about the customer and EMC's product strategies for the customer.  In the weeks before his resignation from EMC, Cochran had sought further responsibility for dealing with the customer in his sales capacity.

110.    During an August 21, 2013 meeting with this customer, the EMC Commercial Account Manager observed a recent email sent by Cochran (at Pure Storage) to the IT employee, in which Cochran introduced himself as a Pure Storage representative interested in selling Pure Storage products to the customer.

111.    On information and belief, Cochran also caused Pure Storage to solicit various additional EMC customers in violation of Cochran's KEA, including a Dallas-based global e-commerce company.  That company is a long-time EMC customer who had been assigned to Cochran and who purchased EMC products directly from Cochran while he was still employed by EMC.

112.    During his tenure with EMC, Cochran was assigned to sell, and did make six-figure sales of, EMC's enterprise storage products to a nationwide corporation with offices in Texas.  Cochran obtained sensitive information about this corporation during his employment by EMC and as a consequence of his engagement on EMC's behalf with this corporation.  Cochran improperly retained EMC Property – expressly labeled "EMC Confidential" – relating to this corporation.  EMC has recently learned that Pure Storage is now soliciting this corporation.  Pure

Storage is aware that this conduct is unlawful.  On information and belief, Pure Storage has induced the misconduct described above, and has ratified or agreed to accept the benefits of this misconduct.

113.   On information and belief, Cochran, on behalf of himself and Pure Storage, has used EMC Confidential Information and Property in order to solicit business from EMC customers and to unlawfully compete against EMC, including knowledge of ongoing and potential customer relationships, and knowledge of EMC's product technologies, capabilities and architecture, and its unique business processes, methods, and pricing methodologies and strategies.  For example, while at EMC Cochran obtained Confidential Information about each of the three EMC customers discussed above, including information about the architecture and operations of each of these company's enterprise storage requirements, the architecture that EMC was proposing to sell to these customers and EMC's sales and pricing strategies related to these customers.  On information and belief, Cochran used this information and his specialized knowledge of the particular characteristics and performance of EMC's products, to solicit these companies and to compete unfairly against EMC in an effort to win business on behalf of Pure Storage at the expense of EMC.  The Court recently Ordered Cochran to return EMC's Confidential Information and to certify the completeness of that return, and entered a Stipulated Order regarding Cochran's non-solicitation obligations and obligations to not possess or use EMC Confidential Information.

114.   On information and belief, Pure Storage is using the Confidential Information provided to Former Employees, including Cruey, Nunley, O'Shea, and Cochran to quickly and efficiently target potential recruits from EMC, as well as active purchasers of enterprise storage

products and services that would otherwise require months or years of investment and effort to obtain.

115.    As demonstrated above, EMC has taken extensive measures to stop Pure Storage's systematic pattern of illegal conduct.  It wrote notices to the Former Employees and to Pure Storage reminding them of the ongoing KEA obligations owed to EMC.  It sent cease and desist letters to the Former Employees and to Pure Storage.  It also initiated lawsuits against no fewer than six Former Employees.  *See EMC Corporation v. Cruey et al.*, Suffolk Superior Court, Civil Action No. 13-0843-C; *EMC Corporation v. Tanner*, Suffolk Superior Court, Civil Action No. 13-2043-A; *EMC Corporation v. Cochran*, U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-12380-PBS; *EMC Corporation v. Johnson*, U.S. District Court for the District of Massachusetts, Case No. 1:13-cv-12639-RWZ.  Yet, Pure Storage's unlawful conduct continues. Accordingly, EMC has brought this lawsuit to finally put a stop to the unlawful conduct being orchestrated by Pure Storage and for full redress of all harm it has caused EMC.

## **FIRST CAUSE OF ACTION**

### **(Misappropriation of Confidential Information and Trade Secrets – Common Law)**

116.    The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

117.    As a result of the conduct described above, Pure Storage has misappropriated EMC's Confidential Information and trade secrets, including, but not limited to, the Confidential Information and trade secrets appropriated by the Former Employees and other EMC Confidential Information and trade secrets.

118.    That information is confidential, competitively sensitive, and owned by EMC.  It has independent economic value by virtue of not being known to EMC's competitors, including Pure Storage.

119.    EMC takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its Confidential Information and trade secrets, including, but not limited to, requiring employees to sign KEAs, requiring its customers, partners, and vendors to sign non-disclosure agreements, password protecting its computer systems and employing numerous electronic data and physical security measures at all of its facilities.

120.    Pure Storage was made aware and knew that use or disclosure of EMC's Confidential Information and trade secrets was prohibited.

121.    As described above, Pure Storage, on information and belief, knowingly assisted its employees in acquiring, using, and disclosing EMC's Confidential Information and trade secrets for Pure Storage's benefit, without EMC's express or implied consent.

122.    As a result of Pure Storage's misappropriation of EMC's Confidential Information and trade secrets, EMC has suffered and will continue to suffer harm, including actual loss.

## SECOND CAUSE OF ACTION

**(Misappropriation of Trade Secrets - M.G.L. Ch. 93, § 42 and 42A)**

123.    The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

124.    EMC has information, tangible or intangible or electronically kept or stored, that constitutes, represents, evidences or records a secret scientific, technical, merchandising, production, or management information, design, process, procedure, formula, invention or improvement.

125.    This information is used in EMC's business and it has independent economic value by virtue of not being known to EMC's competitors, including Pure Storage.

126.    EMC takes, and at all relevant times has taken, reasonable steps to preserve the secrecy of that information.

127.    Pure Storage, on information and belief, stole, unlawfully took, carried away, concealed, copied, or otherwise used this information from EMC, with the intent to convert that information to Pure Storage's own use.  This conduct was willful, knowing, and/or in bad faith.

128.    Pure Storage's conduct violates the Massachusetts Trade Secrets Act, M.G.L. ch. 93, § 42 and 42A.

129.    As a result of Pure Storage's conduct, EMC has suffered and will continue to suffer irreparable harm that cannot be adequately addressed at law.  Unless injunctive relief is granted, EMC will be irreparably harmed in a manner not fully compensable by money damages.

### THIRD CAUSE OF ACTION

**(Tortious Interference with Contractual Relations)**

130.    The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

131.    As a result of the conduct described above, Pure Storage has tortiously interfered with EMC's contractual relations with the Former Employees.

132.    The Former Employees identified above entered into a valid, binding and enforceable KEA with EMC whereby they were obligated, in relevant part, to refrain from soliciting EMC employees or EMC customers for a proscribed period, and from using or disclosing EMC Confidential Information.

133.    Pure Storage knew of the Former Employees' KEAs at least as of the date Pure Storage received copies of EMC's letters reminding the Former Employees of their continuing

obligations under their KEAs.  In addition, Pure Storage knew or should have known that the Former Employees' continued solicitation of EMC employees and customers, and disclosure and use of EMC Confidential Information, violated their respective agreements with EMC.

134.    On information and belief, Pure Storage knowingly, intentionally, and improperly induced the Former Employees to breach their KEAs before and during their work for Pure Storage despite its knowledge that the conduct was unlawful, and actively encouraged the Former Employees to use EMC Confidential Information to solicit additional EMC employees and customers.

135.    Pure Storage maintained an improper motive and used improper means in interfering with EMC's contractual relationships without lawful justification or legitimate reason.  The improper motive includes, but is not limited to, Pure Storage's desire to use and to possess EMC's Confidential Information and trade secrets, and to identify and target EMC customers and EMC employees using this information.

136.    As a direct and proximate result of Pure Storage's actions described above, EMC suffers and continues to suffer irreparable harm and money damages.

### FOURTH CAUSE OF ACTION

**(Tortious Interference with Advantageous Business Relationships)**

137.    The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

138.    As described above, EMC has established the leading reputation in the enterprise storage market and has developed critically valuable, advantageous relationships with its customers.

139.    Pure Storage viewed EMC as its primary competitor for potential customers, and knew of EMC's existing, advantageous relationships with those customers.

140.    Pure Storage intentionally interfered with those advantageous relationships through improper motives and means.  Specifically, on information and belief, Pure Storage knew of, and directed, the Former Employees' use of EMC Confidential Information in soliciting those customers.  Pure Storage also knew that solicitation of certain of those customers was prohibited by the terms of the Former Employees' KEAs, and, on information and belief, continued to direct such solicitation and cause the violation of the KEAs.

141.    EMC has suffered, and will continue to suffer, actual harm as a result of Pure Storage's tortious interference with its advantageous business relationships.

## FIFTH CAUSE OF ACTION

### (Aiding and Abetting Misappropriation of Trade Secrets)

142.    The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

143.    On information and belief, Pure Storage was aware of the misappropriation of EMC Confidential Information and trade secrets that is described above, and it knowingly and actively participated in or substantially assisted the Former Employees in their use of that information, including to actively solicit other EMC employees and customers.  Pure Storage encouraged and substantially assisted the Former Employees in these activities with full knowledge that the Former Employees were breaching a legal duty to EMC.

144.    As a direct and proximate result of Pure Storage's aiding and abetting the Former Employees' misappropriation, EMC has been injured and Pure Storage has been and will continue to be unjustly enriched.  The exact amounts of these damages and unjust enrichment are not presently ascertainable, and are in excess of the minimum jurisdiction of this Court.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

145.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

146.     As a result of the conduct described above, including Pure Storage's intentional interferences with contractual relationships and misappropriation of EMC Confidential Information, Property and trade secrets, Pure Storage received a benefit from EMC, including but not limited to, business opportunities, revenue, funding and increased market share, to which Pure Storage was not entitled.

147.     Pure Storage has improperly, and without consent by EMC, retained this EMC Property, as well as revenues derived from such EMC Property, to which it was not entitled.

148.     Pure Storage had, and has, no legitimate entitlement to this EMC Property or the revenues derived from such EMC Property.

149.     On information and belief, Pure Storage has continued to use the ill-gotten property and revenues for its own benefit.

150.     The taking and retention of this benefit is both inequitable and unjust.

151.     As a direct and proximate result of Pure Storage's unjust enrichment, EMC has suffered substantial injury, including but not limited to loss of customers and market share.

152.     Pure Storage's actions have been willful and outrageous and undertaken with reckless indifference to the rights of EMC.

## SEVENTH CAUSE OF ACTION

### (Violation of Mass. Gen. Laws c. 93A, §§ 2 and 11)

153.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

154.    EMC is a "person" and engages in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, § 1.  Pure Storage is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

155.    The conduct constituting violations of M.G.L. c. 93A occurred primarily and substantially in Massachusetts.

156.    Pure Storage's activities as set forth above constitute willful and knowing violations of M.G.L. c. 93A, §§ 2 and 11.

157.    As a result of Pure Storage's violations of M.G.L. c. 93A, §§ 2 and 11, EMC has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

## Jury Demand

EMC demands a trial by jury as to all claims that may be tried to a jury.

## Prayers For Relief

WHEREFORE, Plaintiff EMC Corporation respectfully requests that this Court enter judgment in its favor and grant permanent injunctive relief as follows:

A.    Enter judgment in EMC's favor on each Count set forth above in this Complaint;

B.    Award EMC damages, in an amount to be proven at trial, caused by Pure Storage's unlawful conduct;

C.    Award EMC double, treble and/or punitive damages as permitted by applicable law, including under M.G.L. c. 93A, §§ 2 & 11;

D.    Enter a Permanent Injunction enjoining Pure Storage, and its officers, agents and employees, and other persons who are in active concert or participation with them, from (1) disclosing, using or possessing any EMC Confidential Information and Property, (2) unlawfully interfering with, or inducing former EMC employees to breach, any EMC KEA, and (3) unlawfully interfering with EMC's advantageous business relationships;

E.      Enter an order directing Pure Storage to return any and all EMC Confidential Information and Property in its possession, custody or control;

F.      Award EMC its costs of suit and attorney fees as permitted by applicable law;

G.      Grant EMC prejudgment and post-judgment interest; and

H.      Award any other remedy and/or relief that the Court deems just and equitable in the circumstances.

Respectfully Submitted,

CHOATE HALL & STEWART LLP


        */s/ Paul D. Popeo*
Paul D. Popeo (BBO No. 567727)
Michael H. Bunis (BBO No. 566839)
G. Mark Edgarton (BBO No. 657593)
Margaret E. Ives (BBO No. 668906)
Kevin C. Quigley (BBO No. 685015)
Two International Place
Boston, Massachusetts  02110
Tele: (617) 248-5000
Fax: (617) 248-4000
ppopeo@choate.com
mbunis@choate.com
medgarton@choate.com
mives@choate.com
kquigley@choate.com

Dated:  November 4, 2013          *Counsel for Plaintiff EMC Corporation*


*Of Counsel*

Paul T. Dacier (BBO No. 616761)
Patricia J. Hill (BBO No. 554834)
EMC Corporation
176 South Street
Hopkinton, MA 01748
Tele: (508) 435-1000


5875001