1       IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3    * * * * * * * * * * * * *    13CV12789-JGD
     EMC CORPORATION            *
4                               *
     VS.                        *    DECEMBER 16, 2015
5                               *    3:08 P.M.
     PURE STORAGE, INC.         *
6                               *
     * * * * * * * * * * * * *    BOSTON, MA
7
8     BEFORE THE HONORABLE MAGISTRATE JUDGE JUDITH G. DEIN

9                  (Motion Hearing)

10               **TRANSCRIPT FROM AUDIO**

11   **APPEARANCES**:

12   FOR THE DEFENDANT:    MICHAEL SHEETZ, ESQ.
                          ADAM S. GERSHENSON, ESQ.
13                        JENNIFER PAVANE KENTER, ESQ.
                          ELIZABETH WRIGHT, ESQ.
14                        Cooley LLP
                          500 Boylston Street
15                        Boston, MA 02116-3736

16   FOR THE MOVANT,       DAVID L. EVANS, ESQ.
     ELLIOTT MANAGEMENT    Murphy & King, PC
17   CORPORATION:          One Beacon Street, 21st Floor
                          Boston, MA  02108-3107
18
                          DAVID PARKER, ESQ.
19                        JOSHUA K. BROMBERG, ESQ.
                          Kleinberg, Kaplan, Wolff & Cohen,
20                        P.C.
                          551 Fifth Avenue, 18th Floor
21                        New York, NY  10176

22   Court Reporter:       Debra D. Lajoie, RPR-FCRR-CRI-RMR
                          One Courthouse Way
23                        Boston, MA  02210

24         Proceeding reported and produced by
                computer-aided stenography
25

1      16 DECEMBER 2015 -- 3:08 P.M.

2          THE CLERK:  The United States District Court for

3   the District of Massachusetts is now in session on

4   December 16, the year 2015, in the matter of EMC v.

5   Pure Storage, Civil Action No. 2013-12789.

6          Could counsel please identify themselves for the

7   record.

8          MR. EVANS:  Your Honor, my name's David Evans.

9   I'm appearing for Elliott Management Corporation, a

10  non-party involved in a subpoena controversy.

11         THE COURT:  Okay.  Who is -- who else is here?

12         MR. BROMBERG:  Joshua Koleman Bromberg of

13  Kleinberg, Kaplan, Wolff & Cohen of New York, also for

14  Elliott Management Corporation.

15         MR. PARKER:  David Parker, also from

16  Kleinberg-Kaplan, for Elliott Management Corporation.

17         THE COURT:  I guess we're hearing that motion

18  first.

19         MR. SHEETZ:  It seems that way.

20         MR. PARKER:  With Your Honor's permission, if we

21  could, we'd appreciate it, since we have a train to

22  catch.

23         THE COURT:  There are lots of trains.  Go ahead.

24         MR. SHEETZ:  Your Honor, Michael Sheetz from

25  Cooley, representing Pure Storage, and along with me is

1    Adam Gershenson, Jennifer Kenter and Liz Wright.

2            THE COURT:  Okay.  All right.  I'm more than

3    happy to hear the motion relating to the documents from

4    Elliott Management first.

5            MR. SHEETZ:  Your Honor?

6            THE COURT:  No?

7            MR. SHEETZ:  I was going to say Ms. Kenter is

8    going to argue that on our behalf.

9            THE COURT:  Okay.

10            MR. SHEETZ:  Thank you.

11            MR. PARKER:  Your Honor, if I could just raise

12    one housekeeping matter, would it be possible to have

13    the transcript of this argument separate from the rest

14    of Your Honor's conference?  Because we're going to be

15    wanting to order the transcript and will not want to be

16    receiving any confidential information that will be

17    discussed --

18            THE COURT:  All right.  We'll reconvene court so

19    that it makes it clear that this is just one section.

20            MR. PARKER:  Thank you, Your Honor.

21            THE COURT:  Okay, though I have to admit, I read

22    the proceedings in New York.  I gather the Judge there

23    was as frustrated.

24            I am unclear, though, as to what the scope is of

25    the information that you think is appropriate.  I read

1  the transcript.  Do you think you're talking about more

2  than the report?

3       MS. KENTER:  We think two things.  It's very

4  limited beyond the report.  The first is the report,

5  and the second would just be documents that relate to

6  the methodology underlying the survey that's contained

7  within the report, some of which we believe likely

8  exists within the report itself and just hasn't been

9  produced and some of which we believe might exist in a

10  very limited subset of documents and communications

11  that were requested in Pure's initial subpoena.

12       THE COURT:  So, this is my fundamental question,

13  and then I'll hear from you:  As far as I can envision,

14  this can only relate in any way to damages; right?  And

15  it relates to the argument that the reason people

16  bought Pure Storage was not based on a personal

17  contact?  I mean, that's the only relevance to this;

18  right?

19       MS. KENTER:  Yes, that's what we see as the main

20  relevance.

21       THE COURT:  So, why isn't it all hearsay?  Like,

22  how does this get used in this case in any fashion

23  unless your expert somehow gathers this information?

24       MS. KENTER:  Your Honor, we believe that this

25  is -- that this contemporaneous market survey should be

1    admissible and that Elliott has been ordered --

2           THE COURT:  Why would it be admissible?  Like,

3    what's -- seriously.  I mean, I'm trying to fashion how

4    this could be admissible -- you want me to take a

5    survey that your expert is not going to validate

6    because they didn't do it and take random information

7    that they gathered from customers who you can call as

8    witnesses to use their out-of-court -- I may be wrong.

9    I may have misjudged this whole thing, so I'm happy to

10   hear it.

11          But that's how I'm reading this, so you need to

12   dispel that for me because, otherwise, what I have here

13   is sort of random pieces of information that, unless

14   you're adopt -- first of all, I'm not even sure it's a

15   defense because I don't even know what the damages

16   approach is here, so I don't know how this refutes the

17   damages.  But assuming that a global picture refutes

18   the damage, I'm not sure how this information would be

19   admissible.

20          MR. SHEETZ:  So, Your Honor, if I might, just on

21   being specifically responsive to the question --

22          THE COURT:  That's good.

23          MR. SHEETZ:  -- that you asked.

24          We're not here, I don't believe, Your Honor, to

25   discuss the question -- we don't need to live up to the

1    standard of admissibility in order for this material to

2    be discoverable as relevant in the case.  So, by --

3          THE COURT:  Okay, but I know the rules of -- I

4    really do know the rules of discovery.  If nothing

5    else, you've taught me the rules of discovery.  So, I

6    know that it's -- but help me, help me -- see, I need

7    to understand what use you think you're going to make

8    of this.

9          MR. SHEETZ:  Sure.  So -- but I do think it's

10   important, Your Honor, that I address the use we

11   intended to make of it in the context of discovery, as

12   distinct from the ultimate potential admissibility of

13   the material at trial, whether it is or is not.

14         The subpoena was issued in August, and since

15   that time, so for the last four months, we've been

16   fighting an effort by Elliott, one of EMC's largest

17   individual shareholders who's had lots of

18   communications back and forth with EMC, about the

19   production of this survey.

20         By the way, in my very, very first conversation

21   with counsel, counsel sitting here, about the topic of

22   the survey and the compliance with the subpoena, there

23   were no -- none of these World War III issues about the

24   survey itself.

25         And what we hoped to glean from the survey from

1    the context of discovery, Your Honor, at the time was

2    the ability to cross-examine EMC witnesses concerning

3    communications with Elliott and the conclusions drawn

4    in the survey by this independent third party who was

5    at least ostensibly not commissioned by EMC.

6         Now that Elliott has been successful in

7    withholding production for all these many months, we

8    still have the opportunity, Your Honor, to use the

9    results of the survey for -- at minimum, for

10   cross-examination purposes, at minimum to work and

11   challenge EMC's expert report, whether -- at deposition

12   of their expert, that's at minimum, quite apart from

13   the question of whether or not we're ultimately able to

14   actually admit it or would even need to admit it at

15   trial.

16        So, that is my specific response to what you had

17   to say, Your Honor.

18        THE COURT:  So, you're saying that the

19   relevant -- you're saying that their damage expert says

20   that globally -- I don't know.  I haven't seen any -- I

21   haven't seen any expert report, so --

22        MR. SHEETZ:  Nor have we, Your Honor, but EM --

23        THE COURT:  -- so, one theory of damages could

24   clearly be specific lost sales; right?  You, specific

25   salesperson, who shouldn't have -- I mean, the theory

1  is shouldn't have been hired, made the following -- I

2  mean, that's the theory.  I have no idea what's going

3  to show that.

4          MR. SHEETZ:  There are going to be plenty of

5  theories right along those lines.

6          THE COURT:  Huh?

7          MR. SHEETZ:  There will be plenty of theories

8  right along those lines, yes.

9          THE COURT:  Okay.  So, the theory is that you --

10  that Pure Storage inappropriately hires X number of

11  salespeople who make X number of sales, which are the

12  damages, at which point, none of this is at all

13  relevant.

14          It seems to me that at some point we had a

15  discussion about whether or not the theories of the

16  case had to do with sort of global marketing of -- I

17  don't know how you defend that kind of damage claim

18  with "my product's better than yours."

19          MR. SHEETZ:  So, a critical issue in this case

20  is the decision-making process of the ultimate buyer.

21          THE COURT:  Why?

22          MR. SHEETZ:  Well, I'm very confident,

23  Your Honor, that, absent some nexus between -- some

24  causality between the actual efforts of a Pure Storage

25  salesperson who used to work for EMC and a

1    customer-buying decision, actually, EMC's ability to

2    prove that nexus, they're not going to be able to get

3    damages, I certainly hope, as a result of a customer's

4    independent decision to purchase a Pure Storage box

5    over an Extreme I/O box.

6         And so their theories of damage go all the way

7    from let's call them direct; that is, John Thomas,

8    salesperson, left EMC one day, joined Pure Storage

9    the next day, the next day walked into an old account

10   that, that person had and ultimately made a sale; to

11   Pure Storage hired John Thomas who never -- who worked

12   for EMC, he never went into any of his old accounts,

13   but he did accomplish sales on behalf of Pure Storage

14   in a competitive environment against EMC's product, and

15   we should get -- we should be able to recover all that

16   as well.  And so I think -- I think --

17        THE COURT:  And do you know that that's their

18   damage theory?

19        MR. SHEETZ:  Yes, absolutely.

20        THE COURT:  Okay.

21        MR. SHEETZ:  Do we know specifically the

22   numbers, the particular sales?  I mean, basically we're

23   waiting for the damages report like everybody else is

24   on that.  But the answer to your question is:  Yes,

25   they disclosed that specific theory and said they are

1    going to pursue it --

2         THE COURT:  Okay.

3         MR. SHEETZ:  -- along with other damages

4    theories related -- not related to sales but related to

5    call it costs of, you know, employee training and

6    retention and substitution and the like.

7         So, the customer-buying decision and the level

8    of proof ultimately that you're going to require them

9    to have in order for a particular sale to fall into the

10   EMC damages column is an absolutely critical component

11   of this case, and the reason we sent the subpoena in

12   August, back when we had four months of discovery left,

13   was to explore EMC's knowledge of and this independent

14   third-party survey's results of actual customers'

15   buying decisions during the exact time period involved

16   in this case.

17        THE COURT:  Okay.  So let her argue the motion.

18   Go ahead.

19        MS. KENTER:  Your Honor, I would agree with

20   everything that's been said --

21        THE COURT:  You need to.

22        MS. KENTER:  -- and I think Mr. Sheetz got to

23   the heart of why these documents are relevant, which is

24   all we're here to determine.  Judge Daniels, as you

25   know, Your Honor read the transcript, Judge Daniels

1  considered and rejected Elliott's additional argument

2  that they want to put before you.

3       THE COURT:  I don't buy that.  I have to tell

4  you, don't go there.  I think that the Judge was

5  confronted with a lot of issues, and he was trying to

6  figure out whether he should be dealing with this at

7  all.  And you know, you thrust him in to -- with a lot

8  of pleadings in to a case that he knew nothing about,

9  and that's -- I don't have a written decision that is a

10  considered analysis of the Federal Rules, so I am not

11  going to go that way.

12       I think if the Judge had issued a decision that

13  said, Federal Rules don't apply, would be one thing.  I

14  don't think that I have that affirmative decision, and

15  I think he read the rule very narrowly to relate to

16  opinion evidence, and I think that the rule says

17  opinion and information, so it's not pre-judged.

18       MS. KENTER:  Sure, Your Honor.  We do think that

19  Judge Daniels' order that sent us here, that sent us

20  back here in which he asked that we determine whether

21  these documents are within the scope of discovery, we

22  do think that that's limited to the question of whether

23  these documents are relevant to this case.

24       And so, we do think that it's -- the position is

25  that and that Judge Daniels repeatedly -- I understand

1    your ruling, your decision that he hasn't officially

2    ruled on those other matters.  We do think that

3    Judge Daniels stated several times throughout the

4    transcript that he was going to send questions of

5    relevance back to this Court and that that's why

6    we're -- we understand that that's why we're back here,

7    because he --

8            THE COURT:  I think he had questions as to,

9    where did this fit in to hotly contested litigation.

10           MS. KENTER:  Yes.

11           THE COURT:  And was also confused -- I don't

12   know that he was confused.  I was confused about the

13   scope of what you're asking for because what you do is

14   you file this really broad document request, and then

15   you say to the Court, Now, please read the following

16   six months of e-mails that are all attached here so

17   that you can see what we're really fighting about, and

18   that's just not a way that I'm going to practice, so

19   just understand that.

20           MS. KENTER:  Understood, Your Honor.  And I

21   apologize if that was confusing.  And as I said, we're

22   here on really two very limited things.  It's the

23   survey report, which we know exists and which we've

24   received small parts of, but we think there is more

25   relevant and responsive information within there; and

1   it's documents that underlie the survey that's included

2   within that report that go to the methodology behind

3   the survey.  That's it, Your Honor.

4        THE COURT:  Okay.

5        MS. KENTER:  And on those two, we think that

6   those two are very clearly relevant for the reasons

7   that Mr. Sheetz just outlined, that they go directly to

8   Pure's defenses to EMC's claims --

9        THE COURT:  Why do you get to use the

10  methodology?

11       MS. KENTER:  The methodology, Your Honor, goes

12  to understanding the survey that underlies the report

13  and also, as Your Honor as hinting at, would go to our

14  ability to use it, to understand it and to possibly

15  make it admissible.

16       THE COURT:  Do you think you can admit this

17  report?

18       MS. KENTER:  Again, Your Honor, we don't think

19  that that's the relevant question here.

20       THE COURT:  No.  I mean, I need to -- I'm just

21  trying to work it through.  I'm just trying to work

22  through where this goes.  I mean, your expert is going

23  to adopt this report?

24       MS. KENTER:  As Mr. Sheetz said, we believe that

25  we can use it at least as -- in cross-examination of an

1    expert that EMC puts forth.

2         THE COURT:  Well, then you don't need it for the

3    methodology -- right? -- because EMC is not going to be

4    testifying as to the methodology that was in this

5    report that they didn't do.

6         MS. KENTER:  We do think that we need to

7    understand how the survey was conducted and that our --

8    any examination or any use we're going to make of the

9    survey will be much more useful and effective if we

10   understand who was reached out to, who was targeted,

11   how they were targeted, who responded, what the

12   questions were that were asked, any information we can

13   get about those types of things that underlie the

14   survey because there are so many variables that go in

15   to how a survey is conducted, really makes the survey

16   more useful besides just having a graph.

17        THE COURT:  But is anybody intending to submit

18   the survey?  I'm sorry.  I'm really -- I just don't --

19   I can't figure out where it fits in here.  I can't

20   figure out how a third party's report fits in.  And I'm

21   accepting for present purposes Elliott's

22   representation, I think, that they don't have the

23   underlying data; right?  So the underlying data is not

24   the issue here --

25        MS. KENTER:  Well, I believe what Elliott said

1    is that they don't have the exact survey itself and the

2    under -- the entire survey.  We do believe that they

3    have more information about the methodology and how the

4    survey was conducted.

5         THE COURT:  But they don't have -- we're not

6    fighting about putting Customer X on the stand and

7    saying, But you filled out this survey that said

8    something different --

9         MS. KENTER:  No.

10        THE COURT:  -- you know; right?  Because they

11   don't have that information.

12        MS. KENTER:  Right.

13        THE COURT:  So, what you want is something that

14   says, This is what makes this statistically

15   significant, this is what makes this -- this is why,

16   you know, out of X number of customers, we picked Y

17   number of customers?  Isn't that seeking to adopt the

18   expert analysis?  But you don't have your expert to do

19   that.

20        MS. KENTER:  So, insofar as we're talking just

21   about the methodology, from what I understand, we

22   just -- it goes to understanding the context of the

23   survey, and it makes the survey, I think, a much more

24   fulsome document and we could have a more fulsome

25   understanding of what is being reported in the survey.

1          Again, Your Honor, we are not -- I understand

2     there are questions about whether -- you have questions

3     about whether the document would be admissible at all

4     at trial.  We don't think that without the methodology

5     we can't use it, but we think that the methodology

6     would make it much more useful.

7          THE COURT:  I can't even figure out who you're

8     cross-examining with it.

9          MS. KENTER:  At this stage, Your Honor, before

10    we're --

11         THE COURT:  Well, at this stage, when you know

12    what the scope of the case is, so we're not on day one,

13    I'm trying to figure out -- and I really -- there's no

14    question that, while I have seen you all a lot, there's

15    a lot that goes on that I don't know about and that I

16    won't learn about until trial, so it may be that there

17    is something that I'm missing here.  But I can't put my

18    head around what you would do with this.

19         MS. KENTER:  So, I would say two things,

20    Your Honor:  First of all, again, as Mr. Sheetz said,

21    we are also waiting for the damages reports, and so we

22    don't have -- you know, I can't tell you specifically

23    exactly what will be coming out in trial in however

24    many months that is.

25         We believe and we understand that EMC's explicit

1   representations to date that they intend to claim

2   damages on a theory that Pure made lots of sales to

3   lots of customers, some of whom for whom they claim

4   there is explicit evidence of improper solicitation,

5   which of course we refute, and some of whom for whom

6   there is not that evidence, and they concede that there

7   is not that evidence.

8           And we think that it is important to Pure's

9   defenses to those damages claimed to be able to show

10  the evidence that we have and the evidence that exists

11  in the marketplace that customers were buying Pure's

12  product for a whole host of reasons that had nothing to

13  do with the salesperson and especially had nothing to

14  do with a salesperson coming from EMC.

15          And so, information about why customers buy data

16  storage product, information about why customers

17  included in the slides that have been produced and that

18  were only produced in Elliott's second production, were

19  not given to us the first time around are slides that

20  discuss specifically what customers perceive as the

21  strengths and weaknesses of Pure's array, as opposed to

22  Extreme I/O's.

23          THE COURT:  And I see what they've produced

24  here, I do, and where I'm missing is the link of where

25  that fits in to this case.

1          MS. KENTER:  We believe it shows or at least

2     helps and goes to show, Your Honor, that customers

3     purchase Pure Storage for a whole host of reasons that

4     have nothing to do with whether or not we hired EMC's

5     employees and that customers -- that lots and lots of

6     factors go in to customers' buying decisions and go in

7     to what was happening in the marketplace at the time,

8     that more customers were moving over to flash storage,

9     as opposed to disk-based storage --

10         THE COURT:  So, are you using -- you're going to

11    have an expert that gets up there, I assume.  I'm

12    hoping that you're not going to do it based on this

13    report; right?  You're going to have an expert that

14    gets up there that says, I'm an expert in the storage

15    world, and in the storage world, these are the new

16    technology.

17         I mean, that's the information that your expert

18    is going to put together based on whatever information

19    your expert is going to put together, which I'm

20    actually assuming is not going to be a report that they

21    can't verify.

22         MS. KENTER:  Yes.  And we will certainly have

23    additional evidence, as you're saying, through expert

24    and other testimony, we intend to have additional

25    evidence of this point.  But we believe that this

1    survey is one more building block of that point, and

2    therefore, it should at least be produced in discovery.

3          THE COURT:  Okay.  Is there anything -- I didn't

4    mean to cut you off.  Is there anything else?

5          MS. KENTER:  If Your Honor doesn't have other

6    questions at this point, no.

7          THE COURT:  Okay.

8          MR. PARKER:  Thank you, Your Honor.

9          With respect to -- with all respect to my

10   adversaries, we have not been talking about what's

11   actually before you today because Elliott does not

12   have -- Elliott Management Corporation, the Elliott

13   entities, do not have the survey, do not have the

14   results of the survey and, with one exception I'll

15   mention, don't have anything relating to the

16   methodology of the survey other than the pages from the

17   report that already have been produced to Pure Storage

18   in this case.

19         So, every page of the report that has any

20   results of the -- the survey and the report are not the

21   same thing.  Pure Storage keeps trying to make it like

22   it's all one thing.  It's not.  The report contains

23   some results of the survey, and every page that has at

24   the bottom "N=661," which means -- is a reference to

25   the fact that it came from the survey, as well as, I

1    might say, every page of the report that even mentions

2    Pure Storage has already been produced to Pure Storage.

3    The only -- I can't read that --

4         THE COURT:  If you write notes -- my rule here

5    is, if you write notes, they have to be legible so that

6    counsel can read them.

7         MR. PARKER:  Thank you, Your Honor.

8         With -- my associate points out to me, with the

9    exception of nine slides relating to the spin-off of

10   the Mware, which I'll get to in a minute, are the only

11   ones.

12        There is one additional slide in the report,

13   which in one little corner of the slide says that there

14   were 661 respondents to the survey.  That's the only

15   thing we haven't produced from the report that relates

16   to the survey and has anything to -- or that has

17   anything to do with the methodology of the survey, but

18   they know that already because the footers on the

19   bottom of the pages we did produce say "N=661."

20        THE COURT:  And was the conscious decision not

21   to produce that page?

22        MR. PARKER:  Because it just contained a ton of

23   other stuff, and it was duplicative of other

24   information that was already being produced, the N=661.

25   And if they want that page, we can give them a redacted

1    copy of that page.

2         THE COURT:  So, I wrote down, and I never trust

3    what I wrote down, but I think that Pure Storage

4    started off by saying, We were talking about the

5    report, and we're talking about the report and the

6    methodology of the survey; is that right, ma'am?  I

7    missed your --

8         MS. KENTER:  Yes, it's the report, the whole

9    report, and then any other documents that, you know,

10   underlie the survey that went in to the report.

11        THE COURT:  Okay.

12        MR. PARKER:  So, if I may, what they're asking

13   for now is not material relating to the survey; it's

14   material that doesn't relate to the survey.  It's not

15   material that relates to Pure Storage; it's material

16   from the report that doesn't relate to Pure Storage

17   that they have acknowledged at the outset they didn't

18   want, and the only reason they want -- they claim

19   they want it now is that somehow Elliott Management

20   was so terrible, that after going to Court before

21   Judge Daniels, had one understanding of what it was

22   going to do, which differed from what Pure Storage

23   wanted, and when Pure Storage complained, rather than

24   engage in motion practice, trying to obviate the need

25   to fight about it, not agreeing with Pure Storage but

1  saying, You know what, it's not worth it, we gave them

2  the additional pages six days later.

3        And instead of saying thank you, we have more

4  motion practice before Judge Daniels, now we have

5  motion practice before Your Honor, trying now to get

6  the material from the report that does not contain

7  results of the survey, does not contain references to

8  Pure Storage.  So, if Your Honor is having trouble

9  understanding how the pages we did produce could relate

10 to this case, think how much more attenuated those are.

11       Now, Judge Daniels did not say, Please go back

12 to Judge Dein and find out what's relevant.  He asked

13 to find out what's within the scope of discovery.  And

14 so, this is not purely a question of relevance.

15 Elliott is a -- Elliott Management is a complete

16 stranger to this litigation.  We now heard for -- I

17 don't know -- the umpteenth time that somehow Elliott

18 Management and EMC are in cahoots.  It's just not so,

19 Your Honor.  Elliott Management is a

20 less-than-three-percent holder of EMC.  It's not the

21 largest holder of EMC.

22       THE COURT:  But that does give it some control;

23 right?  I mean, you did get to pick somebody to be on

24 the Board?

25       MR. PARKER:  We didn't get to pick.  There was

1   an activist campaign, and as disclosed in our papers,

2   there was an agreement where there was some input in to

3   who would get on the Board, yes, but not an Elliott

4   employee, not someone that Elliott has a connection

5   with; industry experts who Elliott wanted on the Board.

6   It had an activist campaign.  It was adverse to EMC.

7          EMC doesn't have the report.  We don't want EMC

8   to get the report, which they would get if they -- if

9   it has to be produced in this litigation.  There's no

10  reason that anybody needs it, and if they -- if either

11  EMC or Pure -- if Pure Storage wants information about

12  EMC and Pure, look at all the people they can ask.

13  They can ask EMC in this litigation, they can ask EMC's

14  investment bankers in connection with EMC's acquisition

15  by Dell, they can ask Dell's investment bankers in the

16  61 billion -- 60-some-odd-billion-dollar acquisition.

17  They must have done a survey of EMC's products and

18  competing products.

19         Pure Storage is involved now in a $3 billion

20  initial public offering.  Somebody must have done a

21  study of Pure Storage and its products and how it fits

22  in the industry.  And every fund whoever invested in

23  either one of these companies -- and we've shown the

24  Court in our latest papers, which were filed last

25  night, that there are two funds that have bigger pieces

1    of EMC than Elliott Management does -- and every

2    analyst who's ever issued a report about EMC or Pure

3    all have information.  They can subpoena the whole

4    world.  It just -- it shows we have nothing to do with

5    this case.

6         But the harm to us of having to produce the

7    report is meaningful.  Elliott is a large -- Elliott

8    Management is a large fund that often engages in active

9    strategy.  They don't want their consideration

10   strategies and thought processes divulged more than

11   necessary in this case, and they certainly don't want

12   the name of their expert consultant divulged in this

13   case because then Pure Storage is going to turn around

14   and try to get information from them, and it's going to

15   harm our relationship with our expert consultant or

16   other experts/consultants that we might use in

17   similar -- that Elliott Management might use in similar

18   circumstances.

19        So, there's substantial potential harm here, all

20   to try to obtain pages from a report that do not

21   contain the survey results or references to Pure or

22   methodology, with that one limited exception that's

23   duplicative --

24        THE COURT:  So, did you produce -- if there was

25   a narrative in the report that explained the survey --

1          MR. PARKER:  There was not.

2          THE COURT:  -- that explained one of the charts

3    that you produced, if there was a narrative that said,

4    According to this -- as seen in Table 12, Pure Storage

5    has a better product than EMC, was that narrative

6    produced?

7          MR. PARKER:  If there had been, we would have

8    produced it, Your Honor.  There was none.

9          THE COURT:  All right.  Okay.

10          MR. PARKER:  Unless Your Honor has --

11          THE COURT:  Well, I'm trying to figure out now

12    what we're fighting about totally.  If you have nothing

13    that deals with the methodology, so does this come down

14    to Pure Storage's just not believing that they've

15    produced all the pages that they say they produced?

16          MR. PARKER:  I think that's the case,

17    Your Honor.  They're making a big deal about the fact

18    that we had a difference of opinion as to what Elliott

19    Management was going to do at the conclusion of the

20    hearing before Judge Daniels.

21          We produced a certain limited number of pages

22    telling them that -- having told them that it would be

23    very limited.  They complained.  We didn't agree.  We

24    said, It's not worth fighting about.  Here's the rest.

25    And now they want everything else.  We gave them an

1    inch, and now they want a mile.

2            THE COURT:  Okay.  I missed your last name.  I'm

3    sorry.  Kender?

4            MS. KENTER:  Kenter.

5            THE COURT:  What are we fighting about?

6            MS. KENTER:  We're fighting about the entirety

7    of the report, and it's for two reasons.  And the first

8    reason is I'd like to respond to the -- what Mr. Parker

9    said right before he sat down, which is that there was

10   a misunderstanding and that they produced what they

11   understood they were supposed to produce from

12   Judge Daniels.

13           And Your Honor, you've read the transcript,

14   you've seen the difference between the two productions.

15   It's simply not believable.  And we've highlighted in

16   Exhibit E to the Gershenson declaration, which was

17   filed with our motion in this Court, several places

18   throughout the transcript before Judge Daniels where

19   Judge Daniels made extremely clear, and I quote, that

20   "References to the survey report would not be things

21   that are redacted" and that Mr. Parker agreed, and I

22   quote, "If there is something in the report that

23   contains survey data or reference to survey data,

24   Elliott understood that they would have to produce

25   that."

1        And so this is not simply a case of a

2   misunderstanding, this is not simply a case of Pure

3   overreacting.  This was really quite an egregious, we

4   think, violation of a discovery order and of

5   representations that were made to a Federal Court, and

6   Pure Storage cannot rely on the representations that

7   Elliott makes in its papers or to this Court or to Pure

8   about what has and has not been produced.

9        Elliott made representations before the Court on

10  October 13th in New York that there was nothing beyond

11  the single page that had been publicly produced that

12  related to the survey at all in its report.  That

13  obviously wasn't true.

14       It has told us repeatedly that there's nothing

15  about the methodology.  I understand Mr. Parker says

16  now that there's something limited.  But, again, Pure

17  Storage cannot rely on Elliott to go back and make

18  determinations about what it thinks is and is not

19  relevant to this case or what is and is not responsive

20  to Court orders because they have proven that they

21  can't do that reliably.

22       And so that's our first point, Your Honor, that

23  Pure believes that, at this point, production of the

24  entire report is necessary to make sure that what

25  should be produced is produced and has been produced.

1          Secondly, Your Honor, we would say that

2     Elliott's arguments that it shouldn't have to produce

3     the remainder of the report because some of it may not

4     be relevant to this case, you know, both parties in

5     this litigation have produced hundreds of thousands of

6     documents, several of which are extremely large --

7          THE COURT:  But they're not a party, they're not

8     a party to this litigation.

9          MS. KENTER:  I understand, Your Honor.  But, you

10    know, the scope of civil discovery is broad, and we

11    don't believe that just because --

12         THE COURT:  It got narrower on December 1st.

13         MS. KENTER:  Indeed, although, Your Honor, we

14    would argue and we have argued in our reply that, first

15    of all, the original rule was in place when we filed

16    this motion, and so we filed under that understanding,

17    but that under the new rule as well, all of the factors

18    that were placed in to the new rule counsel in favor of

19    production in this case.

20         Additionally, Your Honor, Elliott's concerns

21    about production because it claims the information is

22    confidential and that EMC would receive the document

23    if --

24         THE COURT:  Can I ask you a question?  I

25    don't -- I guess I do mean to interrupt, but --

1    MS. KENTER:  No problem, Your Honor.

2    THE COURT:  -- I apologize for doing so.

3    If they are right and that they produced all of

4    the information from this report that relates to the

5    survey or relates to Pure Storage, do you agree that,

6    that is all they need to produce?

7    MS. KENTER:  Your Honor, first we would say we

8    don't believe that they've produced that and --

9    THE COURT:  That wasn't my question.  My

10   question is:  If I look at this document and they have

11   produced everything relating to the survey and

12   everything that mentions Pure Storage or the

13   methodology of the survey, have they complied with

14   their, I'll say, agreement because I don't see it as a

15   Court order to produce, so I'll just say agreement to

16   produce?

17   MS. KENTER:  We would still hold by the argument

18   that the entire document should be produced because

19   documents, you know, should be produced in their

20   entirety, but --

21   THE COURT:  Okay, but I'm not giving you that.

22   MS. KENTER:  -- if Your Honor prefers to

23   undertake an in-camera review and consider whether

24   Elliott has produced everything that references the

25   survey, including, as Your Honor mentioned, you know,

1    any narrative description explaining the survey, then
2    we would --
3            THE COURT:  And do you agree that this -- I'm
4    sorry.
5            MS. KENTER:  No.  I'm sorry.
6            THE COURT:  So, am I right, then?  If they have
7    produced documents reflecting the survey results --
8    right? -- and documents anywhere that mentions Pure
9    Storage and anything that has a description of the
10   methodology, that that is all that they are obligated
11   under whether it be voluntary or Court order to produce
12   from this report?
13           MS. KENTER:  We would agree that that's what
14   they were obligated to produce under --
15           THE COURT:  Okay.
16           MS. KENTER:  -- Judge Daniels' order or
17   agreement in Court that day.
18           THE COURT:  I don't know what I'm fighting about
19   here, I truly don't.  You have a matter of trust, and I
20   don't have this level of distrust, so they haven't
21   earned that from me yet.
22           MS. KENTER:  Well, as Your Honor I think just
23   alluded to, if Your Honor would prefer to undertake an
24   in-camera review, Pure would be amenable to that.
25           THE COURT:  What is that?  Is that

1    objectionable?

2           Let me ask Elliott.  How many pages are we

3    talking about?

4           MR. PARKER:  Your Honor, the report is 200 and

5    some-odd -- 200 -- or in the low 200s.  I don't have

6    the exact number -- 209 pages long.  I just want to be

7    clear that there are nine pages we didn't produce that

8    relate to the spin-off of the Mware that I'm excluding

9    from --

10          THE COURT:  From the survey?

11          MR. PARKER:  -- that I'm excluding when I say we

12   gave them everything from the survey.

13          It's very hard for me not to respond to the

14   personal attack in open Court that, after 40 years of

15   practicing -- 40-odd years of practicing law, I have

16   now lied to two Federal Judges on a discovery dispute,

17   so I'm going to try not to respond to that.  I'm an

18   officer of the Court, and it's very disturbing.

19          THE COURT:  Do you have an objection to me doing

20   an in-camera review?

21          MR. PARKER:  Your Honor, I don't think it's

22   necessary, given what has already been said here and

23   given what I believe is Your Honor's correct assessment

24   that what we're talking about here is stuff that's

25   beyond the survey.  If Your Honor wishes to conduct an

1   in-camera review in order to do that, in order to check

2   me or to see if I've made a mistake, and I must -- and

3   it's -- I also have to say that the comments made

4   before Judge Daniels have to be taken in context to

5   certainly make clear I had not been through the

6   report page by page that is said many times before

7   Judge Daniels, so maybe I shouldn't be defending

8   myself.

9        If that's how Your Honor wishes to proceed,

10  Elliott doesn't think it's necessary, doesn't think it

11  should have to happen, but of course would exceed to

12  Your Honor's wishes.  I want to stress, though,

13  Your Honor, that the pages that we have produced so far

14  have had the name, logo and other identifying material

15  redacted, and if Your Honor wants other pages produced,

16  we would want to do the same thing with respect to

17  that.

18        THE COURT:  Okay.  I need to think about whether

19  or not I need an in-camera review.  I will make a

20  finding, and I'll issue an order that there is nothing

21  beyond these -- first of all, I think that what is

22  being produced is beyond what would be necessary or

23  relevant to this litigation, given the scope of what --

24  I think this is random pieces of paper dealing with

25  what customers may or may not think about this product,

1    and I don't think that that's how this case is going to

2    be tried, and nor do I think that it really leads to

3    the discovery of admissible evidence because everybody

4    knows who the customers are of -- or we have a sense of

5    at least a world of customers who are customers of EMC.

6         So, to the extent that there is the need to

7    understand why specific customers purchased whatever

8    product they purchased, that information can be

9    gathered from sources other than this report, and in

10   fact this report, as represented, does not contain that

11   information.  So, my answer to Judge Daniels will be,

12   No, I don't think that there's anything else that needs

13   to be produced.

14        What I need to figure out is what the most

15   efficient way is, is whether I'm comfortable -- I would

16   love to just say -- I will say on the record that,

17   having reviewed the materials that have been submitted

18   to me, I don't have any reason to doubt that Elliott

19   has produced what it says it was producing.

20        I do recognize, though, that this is a heated

21   battle.  I would like this battle to end.  I would like

22   to move on to actually getting to the trial of this

23   case.  I don't know if I really mean that, but I think

24   I do.  I need to figure out the best way to accomplish

25   that.  I don't know if that -- whether that's an

1    in-camera review or whether I'm buying a bigger problem

2    than I need, and I just -- I don't know yet.  I need to

3    think about that.

4         I'm sort of -- part of me is inclined to just

5    have Elliott sit here with me with the report, which I

6    will not take home in any fashion, and just go over it.

7    Does anybody have an objection to that?

8         MS. KENTER:  We don't have an objection to that,

9    Your Honor.

10         THE COURT:  Does Elliott have an objection?

11         MR. PARKER:  You mean right now or at some

12    other --

13         THE COURT:  Well, I think I probably have to

14    take care of all these other things, but at a moment --

15    at a convenient time when you can leave someone at a

16    lower billable rate with me to go over -- can we do

17    that?

18         MR. PARKER:  Your Honor, we'll do whatever

19    Your Honor wishes.  I'd just say it sounds to me like a

20    Rule 37 sanction is being issued here because somebody

21    doesn't believe that we produced what they want.

22         THE COURT:  I don't want the record to reflect

23    that.  I don't think it's a sanction.  I would like to

24    just end this battle.  I don't want you to go back,

25    then, to Judge Daniels and say, Well, the -- or one of

1   you to go back to Judge Daniels and then say, Well, the

2   Massachusetts Court ruled that it wasn't relevant, but

3   we still don't -- we still have a fight as to whether

4   or not what was produced was actually produced.

5          I mean, like, at some point, this just needs to

6   end.  I would be personally happier if Judge Daniels

7   did that, but I'm not sure that's fair.

8          MR. PARKER:  Okay, Your Honor, we will do it

9   whenever Your Honor wishes at whatever time Your Honor

10  wishes.

11         THE COURT:  All right.

12         MR. SHEETZ:  I do have an alternate suggestion,

13  Your Honor.  The alternate suggestion is -- because

14  Your Honor, even with the assent of the parties, shall

15  we say awkward, being in a position with one side, not

16  the other side, while you are, you know, inevitably

17  having questions, this, that, the other thing, an

18  alternative, given the fact that we do have a very

19  extensive protective order, which --

20         THE COURT:  No, you're not touching this.

21  You're not touching this report.

22         MR. SHEETZ:  Well, I did have a suggestion,

23  Your Honor, but --

24         THE COURT:  Does it involve you touching the

25  report?

1    MR. SHEETZ:  Physically touching?  I don't know.

2    We have a protective order, which provides for an

3    outside attorney's only process of -- my alternate

4    suggestion was that counsel for Pure Storage and

5    counsel for Elliott, without making copies, can sit in

6    Mr. Parker's conference room and go over the report,

7    and Mr. Parker can -- or his colleagues, can show what

8    they produced and what they didn't produce, and if the

9    situation is as he says it is, that's the end of it and

10   you don't ever have to look at it.  Meanwhile, we've

11   not taken any copies, we don't have physical possession

12   of it, we can't use it any other way, we're bound not

13   to tell our clients about it.  What's the possible

14   harm?  That's my alternate suggestion.

15   THE COURT:  I appreciate it.  Elliott or -- I'm

16   sorry.  Counsel?

17   MR. PARKER:  Your Honor, with respect to my

18   adversary, the answer is:  We would not voluntarily

19   agree to that arraignment.  We have voluntarily tried

20   to end this dispute weeks and weeks ago by producing

21   more than we believed we needed to produce or should

22   have had to produce.  There is no chance, in my mind,

23   that we are going to sit down with Pure's counsel and

24   they're going to say, Oh, yeah, great, and then we'll

25   be right back before Your Honor, so if we're going

1   to --

2          THE COURT:  All right.  Can you --

3          MR. PARKER:  -- have to do a review before

4   Your Honor, we'd prefer to do it the way Your Honor

5   suggested.

6          THE COURT:  All right.  And I appreciate the

7   suggestion.  But I think, given the accusations that

8   have gone all over this -- and the only reason I'm

9   doing this is to stop.  I don't do in-camera review

10  lightly, so don't get your hopes up on other documents;

11  okay?  I'm only doing this because it's finite.

12         Do you -- do you need to have somebody come up

13  from New York?  Is that what's -- or can we do it today

14  after the rest of this hearing, or what are we doing?

15         MR. PARKER:  We will do it at whatever

16  Your Honor wishes.  There are practical issues about

17  trains and all about doing it after the rest of this

18  hearing.  If Your Honor wants to do it on another day,

19  either someone from my office will come up or someone

20  from Mr. Evans' office will come over.

21         THE COURT:  Okay.  So, why don't -- just leave

22  Mr. Quinn a contact number, and we'll set up

23  something --

24         MR. PARKER:  Thank you, Your Honor.

25         THE COURT:  -- in the next week or so; okay?

1              All right.  I think that ends this motion.

2              MR. PARKER:  Thank you, Your Honor.

3              MR. SHEETZ:  Thank you, Your Honor.

4              THE CLERK:  Court is in recess.

5              (Adjourned, 3:53 p.m.)

1

2                    C E R T I F I C A T I O N

3

4

5

6

7

8

9            I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10   hereby certify that the foregoing pages are a true and

11   accurate transcription of my stenographic notes (from

12   audio) in the above-entitled case.

13

14

15

16

17

18                    /s/ Debra D. Lajoie

19

20

21

22

23                    12/24/15

24

25