1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4       * * * * * * * * * * * *    13CV12789-JGD
    EMC CORPORATION          *
5                            *
    VS.                      *    DECEMBER 16, 2015
6                            *    3:54 P.M.
    PURE STORAGE, INC.       *
7                            *
    * * * * * * * * * * * *    BOSTON, MA

8

9    BEFORE THE HONORABLE MAGISTRATE JUDGE JUDITH G. DEIN

10                   (Motion Hearing)

11              **TRANSCRIPT FROM AUDIO**

12

13    **APPEARANCES**:

14

15    FOR THE PLAINTIFF:    PAUL D. POPEO, ESQ.
                          ANITA M.C. SPIETH, ESQ.
16                        MICHAEL H. BUNIS, ESQ.
                          Choate, Hall & Stewart LLP
17                        Two International Place
                          100-150 Oliver Street
18                        Boston, MA  02110

19    FOR THE DEFENDANT:   MICHAEL SHEETZ, ESQ.
                          ADAM S. GERSHENSON, ESQ.
20                        ELIZABETH WRIGHT, ESQ.
                          Cooley LLP
21                        500 Boylston Street
                          Boston, MA 02116-3736

22    Court Reporter:      Debra D. Lajoie, RPR-FCRR-CRI-RMR
                          One Courthouse Way
23                        Boston, MA  02210

24

25           Proceeding reported and produced by
                computer-aided stenography

1           16 DECEMBER 2015 -- 3:54 P.M.

2           THE CLERK:  The United States District Court for

3     the District of Massachusetts is now in session on

4     December 16th, the year 2015, in the matter of EMC v.

5     Pure Storage, Civil Action No. 2013-12789.

6           Could counsel please identify themselves for the

7     record.

8           MR. POPEO:  Good afternoon, Your Honor.

9     Paul Popeo from Choate, representing EMC Corporation.

10    And with me are my colleagues, Anita Spieth and

11    Michael Bunis.

12          MR. SHEETZ:  Good afternoon again, Your Honor.

13          Michael Sheetz from Cooley, representing Pure

14    Storage.  And with me at the table is Adam Gershenson

15    and Liz Wright.

16          THE COURT:  Okay.  I think we have too many

17    motions if we have to keep changing counsel too, but

18    all right.

19          What are we up to now?  We have the motion to --

20    EMC's motion to compel relating to Interrogatory 22 and

21    the request for admission?

22          MS. SPIETH:  Sure, Your Honor.  I'll be arguing

23    that.  Anita Spieth of Choate, Hall & Stewart.  So, I

24    hope this one is more straightforward and quite narrow

25    and won't take up too much of the Court's time.  It's a

1   pretty simple and straightforward issue.  So, EMC has

2   moved to compel Pure to produce full responses to two

3   written discovery requests.  It's one interrogatory and

4   one request for admission.

5        The first of the two written discovery requests

6   is EMC Interrogatory No. 22.  EMC's -- one of EMC's

7   claims in this case is a tortious interference with

8   contract claim, and I think the Court probably

9   remembers from seeing us so many times that the

10  contract at issue is the EMC contract, employment

11  agreement, with its employees who left EMC and went to

12  Pure, and it alleges that Pure tortiously interfered

13  with the employment contract between EMC and its

14  employees.

15       And Pure has asserted, in response to that

16  tortious interference claim, the affirmative defense of

17  unconscionability, in other words, the contract that

18  underlies the tortious interference with contract claim

19  is unconscionable.

20       So, EMC posed to Pure Storage Interrogatory

21  No. 22, which seeks an explanation of the

22  unconscionability affirmative defense.  Pure's only

23  response to the interrogatory was to list the

24  provisions of the employment agreement that it views as

25  unconscionable but without providing any explanation of

1    why those contract provisions are unconscionable.

2              THE COURT:  But isn't that because they say you

3    look at these provisions and, as a matter of law,

4    they're unconscionable?  I mean, don't you end up with

5    that argument?

6              MS. SPIETH:  No.  No, we don't, Your Honor.

7              THE COURT:  Okay.

8              MS. SPIETH:  That's certainly not the way we

9    have viewed them as being unconscionable.  And if you

10   read them, I don't think you would agree with that

11   either.  In fact, Pure's own employment agreements

12   contains many of the same agreements -- the same

13   provisions that it calls unconscionable, which is part

14   of why EMC wants to understand what about those

15   contract provisions is, in Pure's view, unconscionable.

16             For example, are they -- did EMC affirmatively

17   do something to make them unconscionable?  Was there an

18   EMC action that made them unconscionable?  Are they

19   unconscionable in scope or time limit and why?  Are

20   they unconscionable under a particular state's laws but

21   not under another particular state's laws?  That's the

22   type of explanation that EMC is seeking.

23             And, you know, this type of contention

24   interrogatory is specifically what was envisioned by

25   the 1970 amendments to Rule 33, which specifically

1    provide that this type of attorney opinion that's

2    sought through contention interrogatories is an

3    appropriate target of contention interrogatory

4    discovery.

5         And the only objection that Pure has put forth

6    in its papers or in the meet-and-confers between the

7    parties is that this interrogatory seeks work product

8    information, and the comments to the rules, Rule 33 and

9    Rule 26, is that -- is clear that, although it might

10   seem like it's seeking work product information -- work

11   product type information, that that's not a proper

12   objection to this type of interrogatory and that

13   they're still obligated to answer.  And in fact, that

14   was the very reason why Rule 33 was amended, was to

15   make clear that this type of explanation, opinion,

16   response is proper.

17        The only sort of hitch, and it's alluded to in

18   Pure's opposition, is that a contention interrogatory

19   must be related to the facts of the case, and this is

20   also made clear in the comments to the rules and in the

21   cases that are cited in our papers.  If a contention

22   interrogatory is unrelated to the facts of the case,

23   then it's not proper, and they need not answer it.

24        But here, where the contention interrogatory is

25   directed specifically at the contract that lies at the

1    heart of a claim, neither party, I don't think, could

2    credibly -- I don't think Pure could credibly argue

3    that that's not related to the facts of the case.  I

4    mean, it's directed right at the contract that lies at

5    the -- or the group of contracts, I should say, that

6    lie at the heart of case, and Pure has never argued

7    that that's unrelated to the facts of the case.

8         THE COURT:  Do you anticipate this coming up in

9    the context of summary judgment?

10        MS. SPIETH:  I would think, yes, Your Honor,

11   that this is the type of argument that might come up at

12   summary judgment, but we're entitled to know now what

13   Pure's positions are, which are why we posed the

14   interrogatory.

15        THE COURT:  Okay.

16        MS. SPIETH:  Should I continue with the second

17   or --

18        THE COURT:  No.  Let's just do the -- we'll do

19   the admissions after.

20        MS. SPIETH:  Okay.

21        THE COURT:  Let's do the interrogatory.

22   Ms. Wright.

23        MS. WRIGHT:  Elizabeth Wright on behalf of Pure

24   Storage, Your Honor.

25        So, to respond directly to two things that

1    Ms. Spieth just said, first, work product has not been

2    our only objection on Interrogatory No. 22.  And Anita

3    really hit the nail on the head when she said that

4    Rule 33 does provide for contention interrogatories

5    that are related to facts or the application of law to

6    facts.

7         And, as Ms. Spieth mentioned, we're not just

8    talking about one contract here.  EMC has asserted that

9    hundreds -- more than a hundred employees have left EMC

10   and come to Pure Storage and that each of those

11   employees has a key employment agreement.

12        Now, the key employment agreement specifies

13   Massachusetts law as the governing law, but these

14   employees live in different states.  And as Pure

15   Storage laid out in its affirmative defense number I

16   believe it was 8, as well as its counterclaims, which

17   we focused on the application of the KEA under

18   California law, and that was because we knew EMC was

19   asserting that three California-based employees had

20   violated their KEAs and because Pure Storage is based

21   in California, we provided an analysis in the

22   counterclaims as to how the KEA could be unconscionable

23   and violate under California law and violate California

24   public policy in two specific statutes.

25        However, at this point, we don't know exactly

1    which former employees will be the subject of EMC's

2    damages analysis, so we do not know exactly which KEAs

3    are really in play.  So, at this point, it would be

4    difficult for us to provide the detailed factual legal

5    analysis that they're seeking in Interrogatory No. 22

6    because we don't know which state laws may be at play.

7    And --

8         THE COURT:  Well, is it your contention as of

9    now that California law makes these unconscionable?

10        MS. WRIGHT:  Yes, as we laid out in the

11   counterclaims --

12        THE COURT:  So, why don't you answer the

13   interrogatory to say that?  I mean, why don't you --

14   why doesn't your answer to interrogatory say, To the

15   extent that this relates to employees who are based in

16   California, California law renders these

17   unconscionable, or Michigan law or -- I mean, if that's

18   the reason that you're arguing it's unconscionable, I

19   think it's important that, that get defined.

20        MS. WRIGHT:  So, at this point, we don't know

21   which of the key employment agreements are going to be

22   the subject of EMC's damages, so we do not know exactly

23   which state laws may be implicated.

24        THE COURT:  Oh, so you don't know which

25   employees you're claiming they -- that they're claiming

1    violated?

2          MS. WRIGHT:  Correct.  I mean, they've

3    provided --

4          THE COURT:  How about starting with the ones who

5    are listed in the admissions?

6          MS. WRIGHT:  Well -- so, yeah, so they have

7    provided interrogatory responses that implicate, you

8    know, dozens of employees, but we don't know that those

9    employees will actually be the subject of the damages

10   analysis until we get the damages report.

11         THE COURT:  I -- whether it's a subject of

12   damages or not, those are the employees that they're

13   claiming violated their contracts; right?  Whether

14   that -- whether that leads to actual dollar amounts or

15   not I don't think is the issue.  I think the issue is,

16   Do you have a sense of who they're claiming breached

17   their contract by becoming employed or that Pure was

18   involved in breaching the contract of specific

19   employees?

20         MS. WRIGHT:  We do, and we agreed to supplement

21   the interrogatory to identify the various state

22   statutes that we believe are at issue beyond

23   California, which is already identified in our

24   counterclaim.

25         THE COURT:  Okay.

1        MS. WRIGHT:  So, we have agreed to do that part

2    of it.  And we have already identified the specific KEA

3    provisions that we believe are unenforceable or lawful.

4    So, the crux of it is that they've asked for a detailed

5    legal explanation that we think goes beyond what

6    Rule 33 envisions for a contention interrogatory and

7    delves in to seeking our legal reasoning or purely

8    legal conclusions.

9         THE COURT:  Is your analysis, though,

10    fact-dependent or not?  For example, is it everybody

11    who has this contract, it violates California law, or

12    is it only this person because they were supplemented

13    by an oral agreement, or there are extraneous facts

14    that would make it unconscionable?

15        I don't know the answer, but I think that if

16    there are other facts that you're relying on, those

17    need to be disclosed.  I think if you're saying,

18    California law does not allow the enforcement of any

19    contract that is two years old or whatever is one

20    thing, and you can just say that, and you don't need to

21    give them case cites; you need to say, These are the

22    statutes, and you'll undoubtedly have a fight as to

23    whose contract is covered by California law, but to the

24    extent that you know whose contract you're claiming is

25    covered by that state's statute, I think that should be

1    identified.

2         I think you can supplement if you get the damage

3    report and it covers people that you didn't anticipate,

4    but I do think they are entitled to know what the basis

5    is for your con -- which of these contracts are you

6    going to seek to set aside on the basis of

7    unconscionability and generally why they violate a

8    statute?

9         MS. WRIGHT:  So, the "generally why" I could

10   envision.  I can't envision providing what EMC has

11   asked for, which is a detailed legal explanation

12   without that getting in to our legal reasoning.  So, I

13   understand that there is a certain -- it's sort of a

14   gray area.

15        THE COURT:  It is gray, but I'm wondering how

16   hard it is at this point.  You can either say that it's

17   statutory, you know, These are the statutes we're

18   relying on; or you can say, Common law, go research it.

19   But I don't think you need to give them the case cites,

20   but I do think you need to give them the theory of --

21   and the facts.  You know, which ones of these do you

22   know you're challenging, or are you challenging

23   everything that's California?  But it sounds like

24   you've agreed to do --

25        MS. WRIGHT:  We've already provided the facts.

1   I mean, the facts were provided in our counterclaim,

2   and they were provided in our initial response to

3   Interrogatory 22.

4            THE COURT:  So, the counterclaim's not under

5   oath; right?  Is that part of the issue here?

6            MS. SPIETH:  That's true.  The counterclaims are

7   not under oath.  And the response to Interrogatory 22

8   is literally just a list.  There are no facts set forth

9   in the response to Interrogatory 22.  So, to the -- and

10  we're sort of starting from ground zero here, and I

11  don't think it should be an excuse, that things are

12  located other places or anything like that.  We just

13  want a response to what was asked.

14           MS. WRIGHT:  Well, but the facts are the

15  provisions in the KEA, which is what we provided.

16           THE COURT:  No, but I think you need to say,

17  It's the length, it's the -- I mean, what makes it

18  unconscionable?  I mean, some states may simply be the

19  existence of a non-compete is unconscionable, some may

20  be the length of time.  I mean, I don't know.  I'm sort

21  of talking blind here because I certainly don't know

22  the law of all these states, but I don't -- what's the

23  objection to providing a narrative with those kind of

24  details?

25           MS. WRIGHT:  I think there is a way that we can

1    do it without us delving too far in to our work product

2    and legal conclusions.  I don't know that, that will

3    satisfy EMC, given what they've sought, which is some

4    detailed legal explanation.

5         MS. SPIETH:  Well, right now we have nothing, so

6    it's hard to really decide in a vacuum if what they've

7    done is sufficient.  But I would say that I think, in

8    responding to the Interrogatory, Pure Storage needs to

9    keep in mind what the rules say about opinion

10   information being proper for a response to an

11   interrogatory and the fact that work product is -- the

12   work product rule, Rule 26, specifically protects

13   documents, and it's not intended to protect the type of

14   information that they're now seeking to protect.

15        So, in other words, if it's the type of thing

16   that they would get up in front of a Court and explain

17   in advocacy of their client, it's the type of thing

18   that needs to go into this interrogatory.

19        THE COURT:  They don't need to give me a brief,

20   and they don't need to give you a brief.

21        MS. SPIETH:  I agree with you, Your Honor.  I

22   agree.

23        THE COURT:  So, to the extent that there's the

24   legal analysis of, These are the prevailing cases, that

25   doesn't need to be done now.  But I think you do need

1    to identify which contracts are at issue in as much

2    detail as you can.  If you know the individuals, that

3    needs to be identified; if you know the states, that

4    needs to be identified; the type of provision that

5    makes it unconscionable.  Is it its mere existence?  Is

6    it the fact that it's a two-party contract?  Is it the

7    fact that it's a four-year contract?  Whatever it is,

8    what are the -- what are the elements that make it --

9    the factual elements of this that make it

10   unconscionable; all right?

11         And I assume that it doesn't -- I assume that,

12   since you have some of the same provisions in your

13   contract and some will be different, that it's not just

14   merely the existence of these statements within the

15   contract; it does require some explanation.

16         MS. WRIGHT:  Understood.

17         THE COURT:  Okay.  So, do we need to set up a

18   time for you to supplement?

19         MS. WRIGHT:  We can -- I would say it's going to

20   take us a good deal of work to do that, given the

21   number of former EMC employees that have come to Pure

22   Storage, so it will take us time to analyze each of

23   their KEAs and to analyze the state laws to figure out

24   where they reside and then to analyze those state laws.

25         THE COURT:  Well, why don't you start with the

1    ones that have been identified as having breached the

2    contract.

3         MS. WRIGHT:  Okay.  Even for those, we're

4    talking about I think more than 40 individuals, so

5    that's 40 different KEAs.

6         THE COURT:  Well, I'm sure they're not all

7    unique.

8         MS. WRIGHT:  No, but they're -- you know, they

9    reside in at least a dozen different states.

10        THE COURT:  All right.  Well, I think at this

11   point, it's time for you to do that.  I mean, if it's

12   that complicated, then it's time for you to put

13   together the case that says, These are the ones that

14   we're seeking to challenge as being unconscionable; all

15   right?

16        So -- all right.  Why don't we just hold a date

17   on that.  When we do the whole schedule, we'll figure

18   out where that has to go; all right?  But you do need

19   to identify which ones you're actually pursuing an

20   unconscionability claim for.

21        MS. SPIETH:  Thank you, Your Honor.

22        So, the second piece of EMC's motion to compel

23   is a request for admission, and like we've discussed

24   today, the EMC employment contract that forms the basis

25   of the tortious interference claim, it contains a

1    non-solicitation of customers clause that we've

2    referenced earlier today in the previous argument.

3        So, what EMC's Request for Admission No. 1 seeks

4    is an admission from Pure Storage that certain specific

5    former employees, now employed -- former EMC employees

6    now employed by Pure engaged in communications about

7    the Pure product with certain specifically identified

8    EMC customers during the one-year period after those

9    EMC employees left EMC.

10        And what Pure did in response was to admit that

11   certain communications happened between the relevant

12   former employees and the relevant customers but refused

13   to admit whether those conversations were about the

14   Pure product and whether they occurred during the

15   relevant one-year time period.  And that sort of

16   reconfiguration of EMC's request for admission renders

17   the request for admission much less useful to EMC

18   because they've sort of taken out the part that makes

19   it meaningful for purposes of a contract violation.

20        THE COURT:  And where did you get this

21   information from?

22        MS. SPIETH:  From discovery in the case.  So,

23   the reason why we chose those specific individuals and

24   the reason why we chose the specific customers was that

25   previous testimony and previous -- documents produced

1    by Pure in the case shows that those specific employees

2    were involved, we say in violation of their contracts,

3    with those specific customers.  So, it didn't just come

4    out of the blue; it came from discovery in the case,

5    and again, we're just trying to narrow things down and

6    get to a point where we don't have to prove that those

7    communications occurred at trial -- or don't have to

8    prove at trial that those communications occurred.

9    Excuse me.

10        THE COURT:  Okay.  All right.  Who's arguing

11   this one?

12        MS. WRIGHT:  It's still me.

13        Pure Storage has provided a sufficient response

14   to Request for Admission No. 1 because Rule 36

15   envisions that you can provide context or qualification

16   if otherwise answering just exactly as the request had

17   been posed would convey an unwarranted and unfair

18   inference.

19        And implicit in EMC's request itself is the

20   unfair inference.  They equate communication with

21   solicitation, and their papers confirm this, that this

22   is how they would want to use EM -- excuse me -- Pure

23   Storage's answers to Request for Admission No. 1.

24        And so, the issue here is that this isn't an

25   interrogatory, it's not a request for production; it's

1    a request for admission, and so our -- whatever answer

2    we provide is conclusively established in the case, and

3    we won't have an opportunity to rebut it or, you know,

4    to otherwise use testimony or documents to explain it,

5    so our answer provided qualification and context that

6    we believed was necessary to provide a truthful answer.

7            THE COURT:  And what about the timeframe?

8            MS. WRIGHT:  We did not answer initially with

9    the timeframe because it was not laid out.  The

10   specific termination date was not provided to us.

11   We -- it would -- we could amend it to make that

12   statement, but again, it goes to the same idea, that

13   they're going to use that admission that it was within

14   the one-year period as -- I mean, the unfair inference

15   would be that it was solicitation.

16           THE COURT:  Okay.

17           MS. SPIETH:  Judge, we specifically worded the

18   request for admission the way we worded it for a

19   reason.  We didn't use the word "solicited" because we

20   knew that the word "solicited" is subject to multiple

21   interpretations and would run us in to trouble with

22   requests for admission, and they would have the

23   opportunity to sort of deny based on their

24   interpretation of the word "solicited."

25           So, we used the word "communicated," which we

1    think only has one fair interpretation, and their --

2              THE COURT:  Which is what?  Can it be lawful?

3              MS. SPIETH:  Yes.  Yes, Your Honor.  And they

4    are perfectly -- as we --

5              THE COURT:  So, what do you get out of this?

6    What do you get about -- because usually the request

7    for admit, you know, it would say, Admit that this is

8    an e-mail that so and so sent to so and so, which would

9    give you a communication; right?

10             But that's not how you phrased it.  So, you

11   phrase it as a communication.  Where does -- how does

12   that move this forward?

13             MS. SPIETH:  Because it gets us beyond having to

14   prove the fact that a communication occurred.  A lot of

15   these individuals are not going to be available to us

16   at trial because they're located in California or

17   beyond the Court's trial subpoena reach, so we're just

18   trying to sort of get some things that are agreed upon,

19   that are demonstrated through the discovery, that both

20   parties have had access to for years now and just sort

21   of streamline what we can.  And that's really the whole

22   intent of requests for admission.

23             And so, that's where we're trying to go with

24   this, and we were trying to get to something that

25   wasn't, believe it or not, going to be a controversy,

1    so that's why we picked the word "communicated" rather

2    than "solicited."  And, frankly, Ms. Wright's desire to

3    not admit it is the entire purpose why we put it forth.

4    You know, they'll be entitled at trial to make whatever

5    argument that they -- or any other time in the case to

6    make any argument they want about what is and is not

7    solicitation and the fact that a communication about a

8    product is not solicitation.  They're entitled to make

9    that argument, but we're also entitled to a fulsome

10   response to our request.

11          THE COURT:  I'm just trying to envision, if I

12   have an admission, then I can read it to the jury.  But

13   I'm going to have to read it to the jury with a

14   limiting instruction that says, Even though there was

15   this communication, it was not necessarily in breach of

16   the contract because it's not a solicitation.  I don't

17   know -- I just can't sort of see how that moves this

18   forward.

19          MS. SPIETH:  Well, we'll still have to prove

20   that the communication was a solicitation.

21          THE COURT:  Right.  For all of these people that

22   you say are not there.

23          MS. SPIETH:  Well, maybe some will be, some

24   won't be.  But I agree with you, Your Honor.  But at

25   least this gets us half -- I mean, I guess you're

1    right, this only gets us halfway there, but that gets

2    us halfway there.  And, you know, we've served the

3    discovery that we've decided to serve, and whether or

4    not it's going to get us all the way there at trial is

5    sort of our own mistake to make.

6            All they're required to do under Rule 36 is

7    admit it or deny it, and it's really no burden on them

8    to just choose one or the other.  If they have a proper

9    basis to deny it, then they can deny it.  But what they

10   can't do under the rules is just not answer it.

11           THE COURT:  Point to me again in this cleaving

12   stack --

13           MS. SPIETH:  Where the --

14           THE COURT:  -- where their answer is.

15           MS. SPIETH:  Their answer is -- it's Exhibit 5

16   to the first Spieth declaration, which was Docket 213,

17   I believe.

18           THE COURT:  215?

19           MS. SPIETH:  213.  Exhibit 5.  I can bring you

20   up a copy too, if that's easier.

21           THE COURT:  Yeah.  Would you?

22           MS. SPIETH:  3 is where their answer starts.

23           THE COURT:  Well, I think that if this is

24   responded to just to add the date, then it's

25   sufficient.  They can -- their objections are valid

1    objections.

2              MS. SPIETH:  So, sorry, just, Your Honor -- so,

3    I understand, Your Honor --

4              THE COURT:  It needs to be supplemented to say,

5    Within the time period or not, as defined by -- EMC has

6    given the time period; right?

7              MS. SPIETH:  Yes, Your Honor.

8              THE COURT:  All right.  Now you know what time

9    period it is?  To the extent that you didn't know when

10   the last termination date -- date of employment was or

11   date of termination was, that information's been

12   provided?

13             MS. WRIGHT:  After we served our response for

14   Request for Admission No. 1.

15             MS. SPIETH:  It was actually first provided in

16   July of 2015, well before, but we provided it again

17   afterwards to be on the safe side.

18             THE COURT:  Okay.  But you need to do it again.

19             MS. SPIETH:  Thank you, Your Honor.

20             THE COURT:  Is this something where, if EMC

21   provided you at least with one reference in the

22   record -- is that something that you can do?  You can

23   say, Per deposition, page so and so or per letter so

24   and so, is that something that, to expedite this, could

25   be done easily?  You say that you pulled these out of

1    discovery.  Do you have that listing?

2         MS. SPIETH:  I think it would probably be

3    equally easier for both of us to find the information.

4    But if it's something Your Honor wants us to do, we

5    could probably put it together.

6         THE COURT:  Well, I think, to the extent that --

7    I'm going to duck, I'm going to let Pure Storage see if

8    you can't easily locate the dates.  I mean, you

9    obviously admitted this based on something.

10        MS. SPIETH:  Oh, the dates, Your Honor?  We

11   could easily get them.

12        THE COURT:  No.  You have the termination date.

13   It's whether the communication took place within that

14   date; right?  So, you both probably know what

15   communications you're talking about because Pure

16   Storage has admitted to some extent that there were

17   communications.  So, I assume you know when those

18   communications took place.  But if that becomes unduly

19   burdensome because you can't find the dates, see if you

20   can coordinate at least a lead as to where the

21   information is derived from.

22        But I'll let the objection stand; okay?

23        We good?

24        MR. SHEETZ:  Yes, Your Honor.

25        THE COURT:  All right.  So, after I was really,

1    really, really, really proud of myself for saying

2    absolutely this trial date is not moving, I was really,

3    really proud of myself, we got a notice for the

4    First Circuit conference, which is that week, so we're

5    not starting on --

6            MR. SHEETZ:  October 17th?

7            THE COURT:  -- October 17th.  We can start on

8    the 24th.

9            MR. SHEETZ:  That's fine with us, Your Honor.

10           THE COURT:  I was so proud of myself.  I

11   couldn't stop laughing when that notice came through.

12   Oh, well.

13           Okay.  So, we'll start on the 24th.  I have

14   blocked until Thanksgiving.  I suggest that you get it

15   done before Thanksgiving because people will be very

16   anxious.

17           MR. SHEETZ:  Could you -- Your Honor, just a

18   question --

19           THE COURT:  Yeah.

20           MR. SHEETZ:  -- could you talk a little bit

21   about your own case management style as it relates to

22   that because --

23           THE COURT:  Because everybody loves trying cases

24   in front of me.  I'm very laid back --

25           MR. SHEETZ:  No, I'm not talking about that so

1   much.  I'm talking about -- we can obviously get to

2   this as it gets closer, but perhaps you could just keep

3   in mind they have a case that's going to take longer

4   than ours to put in, but just at that point at which,

5   you know, we're all squeezed for time, then we have --

6   then we've got to put our case on.

7          So, I think we'll be looking, before we start,

8   obviously, we've got a long way to go, we don't know

9   exactly what the claims are going to be at that point,

10  but we will be looking to see if Your Honor, you know,

11  gives some direction around, you know, how much time --

12         THE COURT:  Okay.

13         MR. SHEETZ:  -- one side has and how much time

14  the other side has.

15         THE COURT:  All right.  So, I don't do time

16  limits; okay?  Where we have flexibility is whether we

17  go full days or half days.  I prefer going half days on

18  a long trial just because I tend to think it's more

19  efficient.  But if we're going to be pressed for time,

20  maybe we start off with full days and then see if

21  things are going smoothly, you know, and then we cut

22  them back down to half days.  Maybe that's where I'm

23  going to have more flexibility.

24         I also, on a case management basis, I prefer,

25  really strongly prefer witnesses to be called once.

1   So, if you're both calling the same witness for any

2   reason, I like to deal with it ahead of time of who's

3   doing direct, who's doing cross but can we get it done

4   once, as opposed to having them come twice.  I don't

5   know if that's a situation here or not, but sometimes

6   it happens.

7         I was -- somebody -- what did they write?  In

8   "Lawyers' Weekly," when they were rating judges,

9   somebody's vote, "She has no peculiarities."  I don't

10  know actually what that means, but I framed it.  I put

11  it on my wall.

12        MR. SHEETZ:  It sounds like a compliment.

13        MR. POPEO:  It sounds good, though.

14        THE COURT:  Is that good?

15        MR. SHEETZ:  It sounds good.

16        THE COURT:  I put it on my wall because I have

17  no peculiarities.  I don't think it's true, but -- I

18  will work with you.  I will work with you.  I mean,

19  I've tried enough cases, I've tried enough big cases to

20  know sort of where the pitfalls are.  I'm happy to work

21  with you to make this go in as smoothly as possible;

22  all right?

23        I do expect courtesies.  I expect you to -- I

24  think -- I have to say, and I'm feeling a little like a

25  mother, but that's because I have a birthday coming up,

1   I feel like your papers are not nice.  You come in to

2   Court and you treat each other with respect, and I

3   think it's very efficient when we get here.  I think

4   the level in some of the pleadings is just over the top

5   accusatory; all right?  And I just ask you to look at

6   it before you file it.

7        What happens is I get to read all of these

8   things, and then by the time I'm done, I'm really happy

9   I'm not practicing anymore, but I'm -- you know, it's

10  agitating, and I'm not sure it moves the ball forward,

11  and I'm being way too honest, I shouldn't be this

12  honest from the Court's point of view, but I find that

13  I need to step back and say, Okay, I'm taking out the

14  exclamation points, you know, What's really the issue

15  here?

16       So, I just ask that -- I mean, you're always

17  wonderful in Court.  The arguments move this case

18  forward, you're all prepared.  I really do appreciate

19  all of that.  It is -- and I'm -- I actually think it's

20  going to be a very well-tried case, and I'm looking

21  forward to it.  Of course you'll settle it after you

22  clear off my calendar for eight weeks, but leave that

23  aside.  But really think about the papers; okay?

24       MR. SHEETZ:  Thank you, Your Honor.

25       MR. POPEO:  Judge, and I will say we do have in

1    fact a very good working relationship, so that's a

2    failure on our part if we might not speak --

3          THE COURT:  I ask you to just re-read them when

4    it's not really late and you're not really annoyed at

5    having to write it; okay?

6          MR. POPEO:  Your Honor, can I clear up one

7    concern only because I'd like to do it now rather than,

8    you know, get us closer to it?

9          Our -- EMC's only concern is that we have a

10   continuous block of time.  I suspect, unless there's an

11   agreement to the contrary with Mr. Sheetz, that many of

12   the witnesses that EMC would like to have testify at

13   trial from Pure Storage, we will be required to put in

14   through video, deposition video.

15         It does -- as you know, that's cumbersome, it

16   does take some time.  We're concerned to go maybe five

17   weeks, and Mr. Sheetz and I spoke, while we all love

18   this case, it may not be quite as captivating to the

19   jury, and we're a little afraid that if we get -- I

20   just want to make sure that you're comfortable that

21   we'll be able to get this in, in a block of time that

22   doesn't require the jury to go away and then come back

23   and --

24         THE COURT:  I have blocked off from October 24th

25   through Thanksgiving, so that is -- there is nothing

1    else on the calendar, and if I put anything else on the

2    calendar, it will be after 4:00; all right?  So, that

3    having been said, I assume there is going to be

4    settlement discussions at some point if -- the earlier

5    you tell me, the better maybe or not.  I am blocking

6    this time, you have it; okay?  So, don't let me waste

7    it.

8            MR. POPEO:  Absolutely.

9            THE COURT:  And what we should do, though, is

10   take care of sort of a lot of the housekeeping stuff

11   earlier, which is, if you have videos, if there's

12   objections to videos, let's, you know, deal with that

13   as early as we can so that once, you know, we have the

14   jury in the box, we're just going forward with it.

15           MR. POPEO:  Absolutely.

16           THE COURT:  Okay.  And to the extent, if you're

17   planning on calling the witness, don't make me watch

18   the video.  Well, you can.  I mean, you can.  Just

19   think about it, that's all I ask.  I'm not going to

20   direct you to do it, but don't -- you know, I'm not

21   going to direct you not to put in your case the way you

22   want.  I mean, I think you have the right to put in a

23   case however you want.  I mean, if you want to bore the

24   jury, you can bore the jury.  I mean, it's okay.  But I

25   would prefer not to see a witness on video and a

1   witness live, the same witness.

2        MR. POPEO:  Understood.

3        THE COURT:  What?

4        MR. SHEETZ:  There is one other motion clean-up

5   we have.

6        THE COURT:  Okay.  What is the status of that?

7        MR. GERSHENSON:  So, Your Honor, we're here

8   again regarding which documents are sufficient to show

9   the falsity of EMC's statements regarding the latency

10  or response time of the Extreme I/O array on the one

11  hand and the Pure Storage array on the other hand and

12  also the endurance of the solid state drives which hold

13  the data, sort of how long does it take before they

14  fail in the Extreme I/O array and the Pure Storage

15  array.

16       THE COURT:  Okay.  So --

17       MR. GERSHENSON:  If I may?

18       THE COURT:  Go ahead, yeah.

19       MR. GERSHENSON:  I've revised the proposed order

20  and also just provided a handful of slides just setting

21  forth quickly the legal background, the claims that

22  have been in this case from the outset, EMC's

23  comparative statements and then the proposed order

24  addressing which documents are sufficient to show the

25  falsity of those statements.

1          As a threshold matter, on Slide 3, we have the

2    legal background.  I've tried to boil it down the best

3    I could.  First, the Lanham Act itself states that, "A

4    party that represents his or her or another person's

5    goods shall be liable."  I believe the history of the

6    Act, actually, originally was about the Defendant's

7    goods, and they added the part about another person's

8    goods, Congress added that, to address comparative

9    statements like we have here, Your Honor.

10         Now, how do you determine falsity?  The message

11   must be analyzed in its full context.  The Courts have

12   said you don't separate the eyes, the nose, the mouth;

13   you look at the entire package, including the visual

14   images, so that you understand the message that's being

15   conveyed to the audience.

16         Now, there are two ways to prove the falsity of

17   the statements, particularly where, as here, EMC's

18   statements implicitly and in some case, with the

19   latency, explicitly say, Tests prove X.  So, the two

20   things that Pure Storage has to do, it's our burden to

21   prove, and we need the evidence to prove it, is one:

22   We can prove the Defendant's product is equal or

23   inferior; or, two, under what's called an establishment

24   claim, you show that the tests did not establish the

25   proposition for which they're cited or the tests were

1   not sufficiently reliable to reach the conclusion that

2   was provided.

3         And the documents that we're looking for are all

4   right in there.  They either show the Defendant's

5   product is either equal or inferior on the relevant

6   metrics, or they go to the testing methodology and the

7   liability of those results.  Discovery and/or statement

8   is permitted regardless of whether a counterclaim

9   contains any specific allegation as to the statement so

10  long as the statement is logically tied to the false

11  advertisement allegations.

12        So, that's our legal background, Your Honor.

13  And I'd just like to direct you, so we're absolutely

14  clear, that there's nothing new under the sun here.

15  There's no stand-alone claim suddenly introduced about

16  EMC lying to its own -- or misleading its own customers

17  separate from the claims that have always been here,

18  and those claims relate specifically to CEO of EMC

19  David Goulden's keynote address at EMC World 2014,

20  that's number one; number two, EMC's underlying testing

21  regime that led to those statements and similar

22  statements at customers; and, three, the "top ten lies"

23  document.

24        That's been the universe, and I should say the

25  "top ten lies" document, that's an EMC customer-facing

1    document that purports to address statements that Pure

2    Storage is supposedly making in the marketplace but in

3    reality is a series of EMC statements about Pure

4    Storage that we say are false and misleading.

5            So, let's look at the claims, as introduced in

6    November of 2014, so this is straight from the

7    counterclaims, Your Honor.

8            THE COURT:  Okay.

9            MR. GERSHENSON:  And I'm on Slide 4.

10           THE COURT:  Yeah, I'm there.

11           MR. GERSHENSON:  EMC's CEO David Goulden

12   compared EMC's product to a product identified as

13   belonging to a start-up competitor.  That competitor is

14   Pure Storage, as been evidenced.  We said in the

15   counterclaims, "In particular, EMC made the following

16   false statements to the marketplace:  That the Pure

17   Storage product is slower than EMC's Extreme I/O,"

18   comparative claim right there.

19           We also said in the counterclaims that EMC's

20   learning information about the performance of Pure's

21   product to make competitive claims about the product,

22   as compared to Extreme I/O or any other Extreme EMC

23   product, violates EMC's obligations under the end-user

24   agreement.

25           THE COURT:  Wait.  Say --

1          MR. GERSHENSON:  I'm sorry?

2          THE COURT:  I'm having a hard time following

3     this sentence.

4          MR. GERSHENSON:  Okay.  So, essentially what

5     we're saying there, Your Honor, is that EMC obtained

6     performance data from the Pure Storage array in

7     violation of the end-user agreement that covers that

8     array, and they obtained that information in order to

9     make competitive claims about our product versus their

10    product.  That's what's --

11         THE COURT:  So, that's not a statement; that's

12    an action.

13         MR. GERSHENSON:  You're right, Your Honor.

14         THE COURT:  Right?

15         MR. GERSHENSON:  Yeah, and I will get --

16         THE COURT:  Okay.  I just want to make sure that

17    I'm --

18         MR. GERSHENSON:  You'll get to the specific

19    statements.  I just want to make sure that --

20         THE COURT:  -- reading this correctly.

21         MR. GERSHENSON:  -- there's no mystery that the

22    issue of comparing products was in the counterclaims

23    from the very beginning.  That's the point we're trying

24    to make there with the red.

25         In addition to this -- these comparative

1    statements, the counterclaim also made clear, per an

2    establishment claim, that the tests that EMC claims

3    support these false and misleading statements and the

4    graphs, which you'll see in a moment from EMC World

5    2014, are not reflective of real-world results.  That

6    goes directly to the establishment claim, the

7    reliability of the tests, the validity of the tests.

8          And then, finally, the third piece that was set

9    out in the counterclaim was also that EMC's "top ten

10   lies" document is false because EMC cannot establish

11   the statements are accurate.  So, that's November,

12   2014, and the universe is clearly defined, including

13   comparative statements, EMC World, the "top ten lies"

14   document and EMC's testing regime.  And that's all

15   we're still talking about, Your Honor, and that's all

16   we will be talking about from here till trial, at least

17   for our case.

18         So, if you're willing, Your Honor, could you

19   please turn to the next slide, Slide 5, and we'll

20   look at one of the comparisons that's at the heart of

21   this case.  This is a slide from EMC World that CEO

22   David Goulden presented to thousands and thousands of

23   customers, potential EMC customers, potential Pure

24   Storage customers, and this video is also streamed

25   online.

1        So, you can see the comparison right there with

2    your own two eyes, Your Honor.  Pure Storage is

3    ostensibly orange line, EMC is the blue line.  And how

4    does EMC caption it?  "Actual Customer Testing for

5    Start-Up All-Flash Array Versus Extreme I/O."  There's

6    no way that this is not a comparison, Your Honor.  And

7    if there was any doubt about what we're looking at,

8    David Goulden made clear in his speech that he was

9    comparing the products, and he was comparing

10   purportedly their real-world performance, what the

11   customers would expect with their array in-house.

12        THE COURT:  Okay.

13        MR. GERSHENSON:  So, David Goulden says, This is

14   a real-world example.  Then here's a comparison right

15   here, "Look at the Extreme I/O system.  It's like a

16   rock.  Performance is a little over 1 millisecond."

17   That's definitely not true, Your Honor.  We have the

18   documents that show that EMC's performance on this test

19   was actually 5 milliseconds.

20        So, he says, "Look at the Extreme I/O system,"

21   then he says, "Now look at what's happening to the

22   competitive system.  The performance numbers are

23   spiking."  So, on the one hand, their product; on the

24   other hand, our product.  And then he says, "The data

25   here speaks volumes for what we can actually do."

1          And that's what we're trying to find out,

2     Your Honor, what can the products actually do?  Is it

3     true that EMC's latency is truly, in the real-world

4     example, so much better than Pure Storage's?  In his

5     deposition, EMC's CEO David Goulden did not back away

6     from the comparisons.  He doubled down.  This is

7     exactly what he said he was doing, and I quote, "We

8     were comparing and contrasting the real-world

9     performance of the systems in real-world environments."

10    That's their defense.

11          He also says, "Performance and consistency are a

12    top criteria for an all-flash array, so I was certainly

13    pointing out that the EMC system Extreme I/O

14    demonstrates these attributes and Pure Storage does

15    not."  So this is what we're getting at, Your Honor,

16    EMC's comparisons of the latency or response time of

17    the products, which is crucial for customers' purchase;

18    right?  You're deciding between Extreme I/O, you're

19    deciding between Pure Storage, one of the big factors

20    is:  How long do I have to wait when I input something

21    in to the computer before it comes back from the

22    storage array?

23          Let's look at the second comparison that EMC

24    made on endurance, and this one is just one document.

25    It's very clear this is extracted from the "top ten

1    lies" document that was flagged, just like the EMC

2    World testing was flagged in the counterclaims a year

3    ago, and here's EMC stating that, in the -- if you

4    look, there's the blue title, "Endurance is not an

5    Issue," and below that, in the middle of the first line

6    under that, this is on Slide 8, Your Honor, "Pure uses

7    cheap and fragile consumer-grade SSDs with one tenth

8    the endurance of Extreme I/O's enterprise-grade SSDs."

9    So, that's the comparison, one tenth the endurance of

10   Extreme I/O's SSDs.

11          Now, we know from the documents that EMC

12   executives knew they had no basis for that claim.

13   Originally, EMC wanted to claim 50 times that, and

14   Mike Wing, their Vice-President of I believe it's

15   Global Sales said, "Let Pure Storage challenge us.

16   Make them challenge us."  And Vice-President of

17   marketing, Josh Goldstein, said, "We have no basis for

18   these numbers.  Why do you do this?  You go out there

19   as a sales guy, but I'm stuck defending these claims."

20          So, instead, they went with one tenth, claiming

21   10X, and in another advertisement they say 20X, the

22   competition.  They're just picking numbers out of a

23   hat.  So, we need to see what the real numbers are,

24   what is their endurance, what is their failure rate.

25          So, Your Honor, those are the claims, those are

1    the statements, and what we think it would be

2    sufficient to show is the following:  We were here last

3    time -- and EMC has already agreed to produce marketing

4    documents and advertising documents showing the latency

5    of their product and the endurance of their SSDs.

6    That's great.  The reason it's not sufficient,

7    Your Honor, is because we're challenging their

8    marketing and their advertising, and we have seen that

9    it is misleading over and over again.

10           For example, for the David Goulden speech, the

11   presentation was based on a presentation to a customer

12   at Best Buy.  We have documents that say, "We tossed

13   away a lot of numbers because they didn't show us

14   strong."  So they're cherry-picking the data from the

15   beginning.

16           Second, we have their data sheets from the time

17   talking about their latency on these kinds of work

18   loads.  Across the board, EMC claimed .5 milliseconds,

19   but on their own test, it's ten times that, Your Honor,

20   which is why David Goulden, A, re-adjusted literally --

21   we've seen documents where they say, Just re-adjust the

22   Y axis, and it'll look like EMC's latency is zero, so

23   they changed the Y axis to make it look like their

24   latency is zero, and then David Goulden says, It's

25   1 millisecond.

1          So, we can't trust the data sheet because it

2    doesn't -- or their other advertising because it just

3    doesn't match up with reality, so we need to see the

4    reality.  So, what is the narrow set of documents that

5    we can get to look at what is really the real-world

6    example to see whether their tests were valid or their

7    product is inferior?  One or the other, as the data is

8    going to show.  So, the question is:  Did customers

9    complain to support?  Did they create support tickets

10   on latency or endurance?  They'll have those documents.

11   There's no question they have them.

12         Similarly, change management system.  Did EMC go

13   ahead and change their product to address problems with

14   latency and problems with SSD endurance?  That's

15   basically the run of it.  But, also for the SSDs, we

16   would just add, Your Honor, the manufacturer's

17   endurance specifications, which are readily had, and

18   the tracking for the endurance or failure rate that EMC

19   surely does when they get returned or otherwise fail.

20         That's all we're looking for, Your Honor.

21         THE COURT:  Okay.  Counsel.

22         MR. POPEO:  With apologies, Your Honor, I'm

23   hearing this in real time with you, so I'm just trying

24   to follow along on it.  The last time, we -- just as a

25   reminder, we were here last, and as I recall, the

1    question was turning on what the actual Lanham Act

2    false advertising or commercial defamation --

3    effectively they're all the same proof standard --

4    claims that Pure Storage has advanced in this case --

5         THE COURT:  Right.

6         MR. POPEO:   -- relate to.  And those claims

7    relate in fact to an assertion that EMC was advertising

8    to the marketplace statements that were false or

9    misleading with respect to the Pure Storage product or

10   the Pure Storage -- the performance of the Pure Storage

11   product.

12        I heard for the -- one of the first times, I

13   believe, last time we were in front of you that Pure

14   Storage instead was construing that claim to relate to

15   EMC's product performance.  We filed a motion today on

16   that very issue because, if in fact what the claim

17   is -- after we left here, the very next day, Pure filed

18   a supplemental interrogatory, which for the first time

19   indicated that in fact their Lanham Act claim is not

20   directed to EMC's false statements about Pure Storage's

21   product or Pure Storage's performance but instead,

22   also, as an additional basis is that what EMC said

23   about its own product, including what it said unrelated

24   to Pure Storage, is also false.

25        THE COURT:  So, is it an issue of whether or not

1    they've always alleged that, in comparison -- that the

2    comparison was false?

3         MR. POPEO:  The issue, if you look at the

4    counterclaims themselves and the responses to

5    interrogatories right up until the day after our last

6    hearing with you, is that these comparative statements,

7    for instance, this one --

8         THE COURT:  Yeah.

9         MR. POPEO:  -- this slide, were false and

10   misleading because they depicted Pure Storage's

11   performance in a way that is inaccurate.

12        I took the 30(b)(6) deposition of Pure's

13   corporate representative on this very slide, and it was

14   told that Pure considers it to be false or misleading

15   because it suggests that the Pure Storage product will

16   always perform this way and that's not true.

17        We've never, never, literally, in this case been

18   confronted with the accusation that something that EMC

19   is saying about its own product or its own product's

20   performance is false or misleading.

21        Now, if that is a new theory of support for the

22   Lanham Act or commercial defamation claims, Your Honor,

23   we learned about it after the close of discovery in

24   this case.  We have taken no discovery on that question

25   as to whether something that Pure now says EMC

1    communicated with respect to EMC's own product's

2    characteristics influenced a buying decision anywhere

3    in the country or, you know, any of those issues.  It's

4    a brand new thrust of the case and deprives of us of an

5    opportunity to conduct the discovery necessary to

6    defeat that type of a claim.

7          We've never even anticipated that kind of a

8    claim because, if the Court looks at the pleadings

9    right up until the last time we were here, the day

10   after the last time we were here, it's very clear that

11   this has always been described as EMC's false and

12   misleading statements about the Pure Storage product.

13   It doesn't matter if that false or misleading statement

14   about the Pure Storage product happens at the very same

15   time where there's information about EMC's product as

16   well.  They've never stood up and said, No; actually,

17   what we think is the Lanham Act violation here is the

18   way that you're depicting the performance of the EMC

19   product.

20         Some of the information in the early part of

21   this slide, for instance, you know, they assert that

22   EMC breached an end-user license agreement.  That's not

23   a basis for a Lanham Act claim.  I'm sort of grappling

24   with --

25         THE COURT:  Well, that's a different issue.

1      MR. POPEO:  Right.  So, I think the question

2   last we were here, Judge, is:  What -- I think we had

3   said we were willing to produce the large majority of

4   what Pure Storage was looking for from us in this.

5   What I was trying to avoid is going back in to, you

6   know, EMC's databases to look for various e-mails

7   traffic and all sorts of iterative documents that might

8   exist but that we've never been asked to look for

9   before relating to EMC's product characteristics.  And

10  when our associates --

11     THE COURT:  Where's the answer to interrogatory

12  that defines this?

13     MR. POPEO:  The new one, Your Honor?

14     THE COURT:  No.  The one that -- up until the

15  close of -- after depositions.

16     MR. POPEO:  I'm not sure that I have it with me,

17  but we've --

18     THE COURT:  Are you changing your theory?

19     MR. GERSHENSON:  No, Your Honor.

20     THE COURT:  Does your answer -- if I read your

21  answers to interrogatories, is it going to say that EMC

22  misrepresented its performance?

23     MR. GERSHENSON:  What it's going to say,

24  Your Honor, is that the slide that we presented was

25  misleading --

1          THE COURT:  Because?

2          MR. GERSHENSON:  It says, Including these

3    statements, these statements, these statements, things

4    like -- it doesn't -- and it says, just to be --

5          THE COURT:  Does any of it include EMC's

6    performance?

7          MR. GERSHENSON:  I don't want to mis-answer,

8    Your Honor.  That's why I'm thinking about exactly what

9    was said.  What I know was said over and over again,

10   and I can look for it, but was that the test was

11   unreliable.  And the key part here is, how are we going

12   to test the reliability, validity of a test, you know,

13   you -- if one part of it you can't test at all, you

14   can't pressure-test at all?  So, that's a key part.

15         Second of all, it's a very limited universe that

16   was at issue here, Your Honor.  One document, the "top

17   ten lies" document, one brief three-minute video, and

18   as you saw in the counterclaims themselves, even before

19   the interrogatories, we said, They're making statements

20   that our product is slower than theirs.  So, there's no

21   mystery about what was going on here.

22         And I do want to address -- I appreciate that my

23   esteemed colleague brought up the 30(b)(6) because, in

24   the 30(b)(6), Mr. Popeo asks, "Have you now described

25   for me each of the EMC statements that Pure Storage

1   asserts to be legally actionable as false and

2   misleading?"

3       The witness says, "No.  There are statements

4   beyond the document they were discussing."  He talks

5   about one of the statements that EMC representatives

6   had made, and then he goes on to -- let's see -- "Those

7   statements are also made using evidence to back them up

8   of graphs that are performance testing, the prominence

9   of which we have no idea, that show an orange line to

10  represent Pure Storage that looks like bad performance

11  and a line to be extremely mild that looks like good

12  performance."

13      That's the basis, you know, that he's saying he

14  never heard before.  I mean, it's been there

15  throughout.  There's no way that anyone, including my

16  esteemed and respected, experienced colleague, can look

17  at that slide and say the only issue here is Pure

18  Storage's performance.  If they're misleading about

19  their own product, that's what we've been saying all

20  along, that they've been -- the comparison is invalid.

21  You can't separate the nose from the mouth from the

22  eyes.

23      THE COURT:  Well, I have to say it's not that

24  simple.  I mean, you're at the end of discovery.

25      MR. GERSHENSON:  Right.  And the testing has

1   been an issue throughout.  I don't think there's any

2   dispute that --

3       THE COURT:  He's not denying that, but he's

4   saying it's your performance, like, you have discovery

5   that says, We didn't have a test, like, you know, We

6   put it up there, and we didn't have support for it.  I

7   mean, all of that is -- I mean, you're telling me you

8   have information that establishes that.

9       It is different to get in to the actual

10  performance.  It's one thing to argue, Look, EMC,

11  you're making these representations when you have

12  absolutely no idea if they're true or you're saying,

13  you know, this is the result of a test and you didn't

14  take a test or -- you know, that's one line of inquiry,

15  and it's a Lanham Act violation, and that's okay.  I

16  don't want to open up discovery on actual performance

17  of EMC if that wasn't part of the case.

18      MR. GERSHENSON:  Okay.  So, your position, if I

19  understand you correctly --

20      THE COURT:  I'm just trying to understand, and I

21  have not memorized -- at this point, I don't remember

22  the details of your briefing.  Last time -- I mean, the

23  first question I had this morning was, Have they filed

24  a supplement on whatever was left?  Because -- I'm not

25  suggesting that you needed to file another brief.

1          MR. GERSHENSON:  No.  We tried to spare you,

2    Your Honor.

3          THE COURT:  No.  That's okay.

4          MR. GERSHENSON:  Especially with the vitriol

5    that has come in past briefing.

6          MR. POPEO:  That was a joke; right?

7          MR. GERSHENSON:  Correct.

8          THE COURT:  I got it.  I know.  Sometimes I feel

9    like we have to put parentheses on the transcript,

10   "Everyone smiled, it was okay."

11         MR. POPEO:  "No hard feelings."

12         MR. GERSHENSON:  But, Your Honor, to be clear,

13   on the SSD endurance, it is the claim that they had no

14   basis and no testing, you're absolutely right.

15         On the latency piece, it's worse than that.

16   Here's what happened:  EMC ran a test, and they looked

17   at the results, and there are notes from the highest

18   ranking EMC executives on the results of the test, and

19   they say, Is this right about Extreme I/O?  In other

20   words, our latency sure is high.  What is going on?

21   Why isn't this commensurate with our real world?

22   That's what they're asking, and that's why they alter

23   and doctor the graph.

24         So, it's much worse than, We didn't have tests.

25   It was, We have a test, it doesn't track our

1    advertising, it doesn't track apparently what we

2    thought our real-world performance was, so --

3         THE COURT:  And do you have that test?

4         MR. GERSHENSON:  We have the test, but what we

5    don't have is the clear divergence from the real world

6    to show that it's not reliable.  I mean, if I test two

7    cars --

8         THE COURT:  But no.

9         MR. GERSHENSON:  Go ahead.

10        THE COURT:  But are you saying that you have the

11   test that shows what they represented wasn't true?

12        MR. GERSHENSON:  No.  Here's what we have,

13   Your Honor:  We have the data sheets that they claim

14   they should have .5 milliseconds on them.  That's

15   Piece A.

16        Piece B, we have the results of their misleading

17   tests on which they themselves performed ten times

18   worse than what their data sheet said, and we have the

19   internal correspondence among the EMC executives

20   saying, Wait.  Is this right?  How can this be right?

21   Because apparently it doesn't track their real-world

22   results.

23        Our point all along is that this test does not

24   track real-world results.  If it's not tracking

25   real-world results for EMC, then it strengthens our

1     argument very much that it's not tracking real-world

2     results for Pure Storage.

3              THE COURT:  So, what are you missing?

4              MR. GERSHENSON:  What we are missing is the

5     real-world results from EMC that are that drastically

6     diverged from in this testing protocol.

7              THE COURT:  So, you have an e-mail that says,

8     This doesn't match reality?

9              MR. GERSHENSON:  Correct, Your Honor.

10             THE COURT:  You don't think they have that?

11             MR. POPEO:  Oh, no, no.  This is a Lanham Act

12    claim; right?  The complaint has never been that this

13    slide reflects EMC at a latency level that's different

14    than an EMC advertisement.  The claim has always been

15    that this slide unfairly reflects the performance of

16    the Pure Storage array.  If you go back and look at the

17    transcript, and I'm going through it now, Pure's

18    witness testified that the thing about this slide that

19    is false and misleading is that it unfairly

20    characterizes Pure's performance as suggestive as

21    performance that a customer should always expect to

22    experience.

23             With the direct question about the testing,

24    anything about that test that we have, we have turned

25    over already.  There's nothing that we withheld or that

1    we want to withhold.  So, if Mr. Gershenson wants to

2    prove that the test itself is unsuitable to reflect

3    worldwide expectations and results, we don't have a

4    problem with that.  We've turned that test over.

5         The issue here is to pivot, after the close of

6    discovery, in a very large, very complicated case, to

7    suddenly say, These are some other things that are

8    false and that support our Lanham Act claim that we

9    pled years ago are that, you know, EMC's own latency

10   characteristics or EMC's own performance is somehow

11   unfair and deceptive or false or misleading with

12   respect to those separate EMC statements.  And I very

13   much would like not to get in to a whole 'nother vein

14   of a Lanham Act defense at this late time.

15        THE COURT:  Well, I understand that you don't

16   want to get into it, and I would like discovery to end,

17   but I just need to -- I just don't know.

18        MR. POPEO:  Yeah.

19        THE COURT:  I don't know -- if it is a new

20   twist, you're not going to get it now because it sounds

21   to me like you have enough on your old twist one way or

22   the other, and I just -- I don't know the answer to

23   that.  So, either I have the materials, or I hate to

24   say this, but can somebody just give me in English,

25   Here's our answer to interrogatory, here's our

1    complaint, here's how we said --

2         MR. GERSHENSON:  Sure.

3         MR. POPEO:  I think, if you did nothing other

4    than -- look, first of all, we did provide a brief to

5    the Court.  If you simply looked at the actual

6    counterclaims and the initial interrogatory response

7    and compared that interrogatory response to the

8    interrogatory response that we got the day after our

9    last hearing, I think you're going to see that this is

10   in fact a new twist, a brand new twist, an entirely

11   different theory of support for a claim that has been

12   in this case for literally two years.

13        THE COURT:  All right.  I'm going to take it

14   under advisement.  I don't know the -- that's the

15   question to me, frankly.

16        MR. POPEO:  That is the right question.

17        THE COURT:  If it's a new twist, you're not

18   going to get it.

19        MR. GERSHENSON:  Your Honor, it's not a new

20   twist.  To be clear, as I said, in the 30(b)(6),

21   clearly he pointed out, What we say is false is our

22   performance on the orange graph and yours on the blue

23   graph, so --

24        THE COURT:  I don't know.  I can't just look at

25   the nose.  I need --

1            MR. GERSHENSON:  We appreciate that.

2            THE COURT:  I need to see the context.  I mean,

3     if he has said, Have you given me -- you know, we've

4     now spent four hours on this thing, is there anything

5     else, and that's a random statement, that's not going

6     to do it.

7            If there's a flag there that says, Hey, you're

8     missing this, we ought to be talking about something

9     else or you've deposed people on EMC's performance, I

10    mean, some --

11           MR. GERSHENSON:  Unquestionably have, and that's

12    exactly -- I apologize, Your Honor.  Continue.

13           THE COURT:  Prove to me that this is part of the

14    case --

15           MR. GERSHENSON:  Sure.

16           THE COURT:  -- okay?

17           MR. GERSHENSON:  We have --

18           MR. POPEO:  Right.  Tie it to the actual

19    allegation; right?

20           MR. GERSHENSON:  And to be clear on your point,

21    when we wrote Interrogatory No. 8, we had literally

22    received, only that day, the test data.  And we

23    explicitly reserved the rights to supplement based

24    on the upcoming depositions -- this had not yet

25    happened -- EMC's CEO, David Goulden; EMC

1    Vice-President, Josh Goldstein, who ended up being the

2    30(b)(6) witness on this and was intimately involved in

3    this; and the Sirius people who are the channel

4    partners, that's a value-added reseller who conducted

5    the testing at Sirius that EMC used.

6         So, it was clear.  And then when we took the

7    deposition, it's exactly as you said, Your Honor, we

8    asked many questions of Josh Goldstein, their 30(b)(6)

9    witness, regarding EMC's performance and why it

10   diverged so wildly from their data sheets.  So, it's

11   been part of case.  There's no mystery.  And I want to

12   be perfectly clear that the -- they keep saying after

13   the close of discovery, after the close of discovery.

14   The only reason that supplement came when it did was

15   because EMC requested delays and extensions.  That's

16   the reason.

17        So, it's a little bit disingenuous, I'm sure my

18   esteemed colleague didn't know the facts behind that,

19   but that's the reality, Your Honor.

20        THE COURT:  I just don't want to -- I'm not

21   letting you re-open the depositions to deal with this,

22   so that's my --

23        MR. GERSHENSON:  There's no need, Your Honor.

24        THE COURT:  -- concern because I think you have

25   more -- you have information here.  It's not like you

1   haven't discovered things.

2          So, what are you -- are you telling me that, if

3   I go back and I read everything that you filed that I

4   thought I didn't have to read, I'll be okay?

5          MR. POPEO:  I apologize.

6          THE COURT:  That's okay.

7          MR. POPEO:  I think that, if you go back --

8          THE COURT:  That was with a smile.

9          MR. POPEO:  Right.  If you read what we

10  submitted, and, again, if you look at the actual

11  counterclaims, they've always -- even in the narrative,

12  they're described as EMC --

13         THE COURT:  Part of it's the counterclaims, but

14  I'm really more concerned about whether this was an

15  opportunity -- whether the opportunity existed to

16  explore this at the depositions and if they were taken

17  advantage of, and if there was questioning about this,

18  then it's going to go, and we'll -- but let me just ask

19  you, what does -- I'm not sure that the discovery that

20  you're asking for establishes what you contend is the

21  problem.

22         And I don't -- so I'm trying to also figure out

23  whether or not, even if I defer ruling on whether you

24  could present this case to -- that claim to a jury,

25  whether the -- you have that discovery to the extent

1    that you need it already and whether or not you

2    actually need this additional stuff.  And some of this

3    sounds to me like a little bit random customer

4    complaints, and I'm not sure that, that is sufficient

5    to establish that the alleged test results were

6    inaccurate.

7           MR. GERSHENSON:  Let me address each piece,

8    Your Honor.  First, on the timing, EMC says, Just look

9    at what we wrote.  I mean, with all due respect, you

10   know, we have 14 days to respond to something that they

11   filed two hours before we walked in here, so I would

12   just ask that you not just look at what they wrote; you

13   allow us to oppose the motion.

14          Second, regarding the discovery --

15          THE COURT:  So, did you file a motion today that

16   addresses this?

17          MR. POPEO:  That addresses, yes, the

18   supplemental --

19          THE COURT:  That says that the new supplement

20   is --

21          MR. POPEO:  -- the December 1st --

22          THE COURT:  -- new?

23          MR. POPEO:  Correct, right.

24          THE COURT:  Okay.  So, presumably you'll -- you

25   will have joined all of the history, then, of --

1      MR. POPEO:  Right.  And I'm not trying to

2  prevent --

3      THE COURT:  Okay.

4      MR. POPEO:  Of course they can brief it.  I just

5  want to point out --

6      THE COURT:  No.  Wait.  Let him --

7      MR. POPEO:  Oh, I'm sorry.

8      MR. GERSHENSON:  And your point is a good one on

9  the new discovery, Your Honor.  If EMC has, you know,

10  tracked their real-world latencies, which I expect they

11  have, we would be happy for them to produce that

12  instead, perfectly fine.  If they have their arrays in

13  operation in the real-world environments exactly like

14  David Goulden described, produce that, produce us, you

15  know, all their arrays with their fluctuations, with

16  everything else, whatever they're tracking real time,

17  so be it.  We're perfectly willing to have that

18  instead, Your Honor.

19      THE COURT:  Why do you need that beyond what you

20  have about the testing?

21      MR. GERSHENSON:  Forgive me if I didn't

22  articulate well enough.  My view is that they tested

23  two products.  Our claim is certainly that the

24  representations they made about our product were not

25  true.  Those representations were made to divert sales

1    from our product to their product.

2         So, we need to prove either, as I said, this is

3    the framework, that their product is inferior or equal

4    to ours on the relevant metric that they're claiming

5    superiority, we have to prove that, or we have to prove

6    the test is invalid.

7         So, if they're having high latencies back of the

8    house, real-world, real-world environments, their

9    product is equal to or inferior, so that's Proof A.

10   Proof B under the establishment claim goes to the

11   validity of the testing.  If their results are way out

12   of whack, let's say their latency is great back of the

13   house, if their results on the test are way out of

14   whack, that is strong evidence that the test is not

15   actually reflecting real-world results.

16        THE COURT:  Okay.  Go ahead.

17        MR. POPEO:  A quick point and an important one,

18   the testing -- we're not fighting them on the testing.

19   If they want to suggest that our ads are false in how

20   they reflect that graph of truest performance and they

21   want to challenge the validity of the testing, they can

22   do that.  They've got everything they need.  That's not

23   a new claim; right?

24        The new part is that they pivot, and it's how,

25   Actually, part of our Lanham Act claims also are that

1   EMC was false and misleading about its own performance,

2   its own product, its own characteristics or anything

3   else, that's new.  On that issue, we've done nothing to

4   defend the claim because we didn't know it existed, and

5   that's what I'm concerned about.

6           The -- as the Court knows, this claim is

7   controlled by what Pure has alleged and what Pure has

8   informed us about during their discovery, their

9   response to our interrogatories and things of that

10  nature.  It's a new -- it's a brand new claim, Judge,

11  and if that becomes a component part of Pure's

12  allegations against EMC, we have to be permitted to

13  defend it because all along it's been we're doing bad

14  things about Pure; right?  We're saying things that

15  aren't fair to Pure, we're even testing in a way that

16  unfairly reflects Pure.  That's fine.  This -- the

17  thing that's new here is to turn around and say, It's

18  actually also about EMC.

19          THE COURT:  Did they depose someone from EMC

20  about -- with knowledge of these issues of the

21  performance?

22          MR. POPEO:  So, they deposed -- so, in that

23  David Goulden slide, that's what we call that slide

24  that you see with the graph, they've asserted,

25  including at the earliest parts of this case, that,

1    that graph unfairly depicts the performance of a Pure

2    Storage array.

3         And, as I said, we've produced all of the

4    people -- all of the documents that we have with

5    respect to that testing, and then we've produced a

6    30(b)(6) witness to tell them what happened, and they

7    asked him whatever they wanted to ask him to show,

8    presumably, that the depiction of the Pure Storage

9    array is somehow unfair in our real world, that the

10   tests aren't accurate, any of that stuff, that's all

11   fair game, there's not a problem at all with that.  The

12   disconnect we're having is this pivot to --

13        THE COURT:  But was there a 30(b)(6) or another

14   specific, I guess, engineering witness to talk about

15   the performance of EMC's product?

16        MR. GERSHENSON:  Yes.

17        MR. POPEO:  No.

18        THE COURT:  He's saying yes, and you're saying

19   no.  How do I know?

20        MR. POPEO:  You're saying something?  No?

21        MR. GERSHENSON:  Well, let me address each piece

22   so that we're totally clear.  First, to answer your

23   question, yes, their 30(b)(6) witness was asked many

24   questions about the performance of Extreme I/O and how

25   it deviated from the data sheet.  That's number one.

1           Second, I just want to clarify something so

2    there's no mystery here.  There is no stand-alone claim

3    that we are pivoting to or anything else regarding

4    false statements about EMC about their own product

5    separate and apart from the comparisons to Pure

6    Storage.  That's what's at issue.  We are not saying

7    EMC lied to its customers about X, and we want damages

8    for that, except in this realm:  We need to check --

9    I'm being clear, Your Honor, that the testing --

10          THE COURT:  Well, but you're asking for the same

11   information.  I mean, you're going to stand up in Court

12   and say, EMC's product doesn't work and that they lied

13   about it.  I mean, that's what you're going to say.

14   Whether you're going to tell me that, that has to do

15   with damages or not, your theory is the same.

16          So, I need to figure out whether it's a theory

17   you put forward before or not.

18          MR. GERSHENSON:  Well, okay.  There are --

19          THE COURT:  It is two different things, to say,

20   one, my product is better than you're depicting it; or,

21   two, your product is worse than you're depicting yours.

22          MR. GERSHENSON:  Your Honor, as you've said,

23   there's the one approach, which is proving their

24   product inferior, which we are entitled and need to do.

25          The other piece is the testing.  So, how do we

1    show that the test was invalid?  We know it doesn't

2    reflect our real-world performance, but if it doesn't

3    reflect EMC's real-world performance, that goes to the

4    testing, which my esteemed colleague has said over and

5    over again, they're fine with the testing, We're fine

6    with arguing about the testing, and then he says we

7    have everything we need.

8         But we don't.  We don't have the piece where EMC

9    diverges wildly from their own real-world example.

10        THE COURT:  Did the test on the part of EMC's

11   product prove what the -- was it accurately reflected

12   in the chart or not?

13        MR. GERSHENSON:  It's an excellent question.

14   So, the answer is the chart was distorted in this exact

15   way:  The original draft showed clearly 5 milliseconds

16   for EMC.  So, then they said, Wait, we can't show that,

17   so they altered the Y axis, they make it look as if

18   it's very low, and then David Goulden says explicitly,

19   Our performance was about 1 millisecond.  So, it was

20   inaccurately represented.

21        THE COURT:  Okay.  And you have that in the test

22   results?  I mean, you have the test results, and you

23   have how they're reflected on the graph.

24        MR. GERSHENSON:  Exactly, Your Honor.

25        THE COURT:  Okay.

1            MR. GERSHENSON:  So, we have test results, but

2    what David Goulden insinuated is, This is why you buy

3    our set -- excuse me.  He said, This is why you buy an

4    all-flash array.  This is a real-world example.  It

5    wasn't.  He said, This is actually customer data.  It

6    wasn't.  These were synthetic tests concocted by EMC,

7    you know, VDbench script, written by EMC specifically

8    to make Pure Storage look bad.

9            THE COURT:  Right.  And you have all of that?

10            MR. GERSHENSON:  The synthetic, yes.  What we

11    don't have is to prove that he's misleading the people

12    on the part that he keeps claiming is real-world data

13    and these are real-world results.

14            THE COURT:  But you have that it wasn't, in your

15    view, real customer data.  I mean, you have what the

16    parameters were of the test.  So, when he stands up

17    there -- when he gets on the stand and you say, Did you

18    represent that this was real customer data, the truth

19    is it wasn't.  I mean, at least that's what you're

20    going to say.

21            MR. GERSHENSON:  Sure.

22            THE COURT:  I assume they're going to have a

23    different explanation; right?

24            But you have that information.  So, you want to

25    take it -- I understand, you want to take it the next

1    step to say, Not only didn't you have it at the time

2    you tested it, but it's just wrong.

3         MR. GERSHENSON:  It's not a real-world example

4    because it doesn't reflect real-world results, which he

5    claimed.

6         THE COURT:  Well, you know that it doesn't if

7    you distinguish between whatever their test parameters

8    were and customer data.

9         MR. GERSHENSON:  We would if we had EMC's to

10   show that it doesn't reflect their real-world results.

11   That's all we're looking --

12        THE COURT:  No.  But you have their testimony

13   that says, We didn't make this chart from our customer

14   data.  No?

15        MR. GERSHENSON:  The answer is yes, but they

16   walk around it.  They say, Well, we're talking about

17   benchmark, we said -- we threw in that it was a

18   benchmark, so that's their way out of that.

19        But the thrust and the message being conveyed to

20   everyone, and in the 30(b)(6) -- excuse me -- the

21   deposition of their CEO, which is clearly binding on

22   EMC, and I'm sure they plan to stand behind it, was

23   over and over again, This is designed to show what the

24   customer experiences in their real world, and they're

25   going to say that at trial over and over again -- we

1     have the deposition testimony -- This is not a corner

2     case, this is not a one-off, this is what the

3     customer's going to experience in the real world.

4     That's their defense.

5          We have an absolute right to disprove that.

6          THE COURT:  Okay.  So, you're going to put this

7     all together in response to his motion?

8          MR. GERSHENSON:  Of course, Your Honor.

9          THE COURT:  Okay.  But -- Mr. Popeo?

10         MR. POPEO:  I just want to point out one thing

11    for the Court.  Pure never asked for us to designate a

12    30(b)(6) EMC witness on EMC's testing.  Everything has

13    always been about whether what we said about Pure was

14    false, misleading and lie.  We're talking about --

15         THE COURT:  Is that in your motion?  Is that

16    argument -- I mean, have you raised that in --

17         MR. POPEO:  I don't know that we pointed out the

18    fact -- I think that's a response to the Court's

19    question.  You said, Did he ask questions?  Whatever he

20    asked -- I never object on relevance in a deposition.

21    I think they'll confirm that, but they may not.

22         THE COURT:  Parentheses, "everyone smiles," end

23    parentheses.

24         MR. POPEO:  Okay.  You know, they've

25    certainly --

1          THE COURT:  Okay.  I don't know.

2          MR. GERSHENSON:  Not me.

3          THE COURT:  He's not smiling, okay.

4          All right.  I don't know.  All I'm saying, I

5     can't do this -- you're both telling me diametrically

6     opposed information, and I just don't know --

7          MR. POPEO:  Sure.

8          THE COURT:  -- all right?  So, you've submitted

9     a motion that spells out the history as you view it.

10    There'll be a response.  If you need to respond to

11    that, please do so briefly.

12         MR. GERSHENSON:  May I just raise one procedural

13    point, Your Honor, which is expert reports are

14    currently due January 15th.  If we don't have this

15    discovery, that will be problematic.  I don't know

16    whether the Court would prefer that we, you know,

17    license to supplement --

18         THE COURT:  Yeah, I think --

19         MR. GERSHENSON:  -- upon receipt.

20         THE COURT:  -- that's how we'll do -- I think

21    for now, the expert reports should be premised on,

22    unless you feel you have enough data otherwise, on

23    EMC's description of what the Lanham Act claims are.

24         MR. GERSHENSON:  Well, I think --

25         THE COURT:  I mean, if you feel that you have

1    enough information to support your claim otherwise,

2    that's fine.

3          MR. GERSHENSON:  Okay.

4          THE COURT:  So, your expert reports are based on

5    the discovery to date.  If I allow additional

6    discovery, you have the right to supplement those

7    reports.  If you feel that you're excluding an issue

8    because you don't have the discovery on it, just so

9    note somewhere, but you will have the right to

10   supplement.  But we're only talking about this very

11   limited discovery, and I don't know how limited your

12   response.  That's my concern; okay?

13         MR. GERSHENSON:  I appreciate that

14   consideration.  Thank you, Your Honor.

15         THE COURT:  But I don't want to move that date.

16   I think you have enough --

17         MR. GERSHENSON:  That's why I suggested the

18   supplemental response.  Thank you, Your Honor.

19         THE COURT:  Okay.

20   Hi.

21         MR. SHEETZ:  Hi.

22         THE COURT:  You've been awfully quiet.

23         MR. SHEETZ:  I have been.

24         THE COURT:  But --

25         MR. GERSHENSON:  He's not feeling well.

1          THE COURT:  What's up?

2          MR. SHEETZ:  It's true.

3          Very briefly, Judge, we were together on the

4     30th, and we were talking about everybody's favorite

5     request for production, Request No. 137, and the Court

6     entered an order asking Pure Storage to produce certain

7     documents, and then we were to talk together with the

8     other side with the hope of working out a deal.

9          And, unfortunately, I hoped that I was going to

10    come back to you and tell you we've got a deal, no

11    problem, but I can't do that.  So, I want to just talk

12    with you briefly about that trouble.  So, you will

13    recall --

14         THE COURT:  Do they know that you're going to

15    talk about this?

16         MS. SPIETH:  I wasn't anticipating it because

17    the order you issued gave us until January 6th, I

18    think, to come to a deal.

19         MR. SHEETZ:  Well, maybe briefly, Judge --

20         THE COURT:  I do have other people going here,

21    so tell me what the issue is, as you see it.

22         MR. SHEETZ:  The issue is, Judge, I expected to

23    tell you -- you'll recall that 137 deals with the

24    changes that were made to the Pure software, changes

25    that relate to the allegations that what EMC said was

1    actionable defamation, the statements should or should

2    not come in.  EMC asked for internal notes, which show

3    that the changes were made -- that they were made to

4    address these very same subject matters that are the

5    subject matter of the counterclaims.

6         The Court asked me -- the Court asked EMC to see

7    if they could narrow the internal documents that they

8    were looking for, and the interim the Court said, Well,

9    I could -- Pure Storage should immediately produce

10   these certain other types of documents, which were the

11   externally facing software changes and hardware changes

12   with respect to these topics.

13        We thought very hard about how we could narrow

14   that and tried to come up with a way of narrowing the

15   subject matter, and we couldn't do it.  We talked to

16   the expert.  We couldn't do it.  So, we came up with

17   another way of trying to narrow it, and here's what we

18   said.  We said, rather than narrowing the subject

19   matter, which is the full complement of what the

20   allegation in the counterclaim is, we said, What if you

21   only give us three documents?

22        The first kind of document is a document    that

23   -- these internal software reports, that's number one;

24   the second kind of document is this post-mortem that

25   was done, or the root cause analysis, again, the

1    internal document; and the third kind of document was

2    these tickets, these software desktop tickets that are

3    otherwise known as gyrals that relate to the changes

4    that were -- or the problems that were related to these

5    subject --

6          THE COURT:  All right.  So, you asked for these

7    categories, and they said no.

8          MR. SHEETZ:  They said no.

9          THE COURT:  Okay.

10          MR. SHEETZ:  And they said no for a couple of

11    reasons.  And --

12          THE COURT:  All right.  This is what I need to

13    you do because I can't -- I'm not following, and

14    they're not -- more importantly, Pure Storage isn't

15    following it.  So, if you have revised your requests,

16    put it in a motion to compel or whatever or supplement

17    your motion to say, This is -- these are what we're

18    requesting now.  And don't make me read the e-mails to

19    get there; okay?

20          Say, This is what we are willing to limit our

21    request to; all right?  This is why we think it's

22    important, and they can respond; okay?  I'm sorry.  I

23    just can't -- I'm not following that, what -- I don't

24    have 137 in my head to do it.  My apologies.

25          MR. SHEETZ:  Fair enough.  Judge, I just don't

1    want -- as Mr. Gershenson said, we have reports coming

2    up.  Can we put a date on the calendar that this will

3    be, you know, allowed a hearing or something like that?

4           THE COURT:  Sure.  Well, I gave you to

5    January 6th to work it out, so I'm -- Ms. Wright, why

6    don't you tell me what -- what schedule do you want?

7    What works?  Where are you in this?  I'm looking for

8    our schedule, which I also seem to have lost here.

9           MR. GERSHENSON:  Well, the expert reports are

10   due on the 15th.  Why don't you just make it that

11   Friday or something, the Friday before, 6, 7, 8.  I

12   made that up, but --

13          (Pause)

14          MR. SHEETZ:  Judge, I think we might already

15   have a hearing scheduled for the 8th.

16          MR. GERSHENSON:  I don't have that.  No.

17          THE COURT:  Okay, I got it.  Thank you.  I don't

18   think we have another --

19          MR. GERSHENSON:  Any time the week of the 11th

20   is fine with me -- with us .

21          MR. SHEETZ:  Yeah, I appreciate -- I'd like to

22   do it the week before.  Again, I'd like to -- it's not

23   like we never have to come back and we reach an

24   agreement, but we'd like to get it done the week

25   before, only because recall that we'll have to get the

1 documents to our expert to work on the expert report

2 that he has to do to respond.

3       MR. GERSHENSON:  I'm out of the country the week

4 before, which is why I keep saying the 11th.

5       THE COURT:  Do you need -- well, so you're not

6 going to prepare anyone.  Can somebody else handle it

7 or not?

8       MR. SHEETZ:  You weren't doing it anyway.

9       MR. GERSHENSON:  Address the Court; all right?

10       THE COURT:  He's sincerely looking.  He's

11 looking sincere.  Can somebody else cover it or not?

12 I'll go with whatever you tell me.

13       MR. GERSHENSON:  I should be here.

14       THE COURT:  All right.  So, unfortunately, we're

15 going to do it, then, the 11th, so --

16       MR. GERSHENSON:  That's fine.  That's fine.

17       THE COURT:  -- we'll do it at 2:00.

18       MR. SHEETZ:  2:00 on the 11th.

19       THE COURT:  Right, Tom?  That's okay?

20       THE CLERK:  Yeah, January 11th.

21       MR. GERSHENSON:  Last bit of housekeeping,

22 there's not argument about -- I'm not arguing about

23 anything.  Last bit of housekeeping.  We have -- you

24 have now approved the expert report, you have the

25 extension of time for the expert report, but you've not

1    actually locked in the other proposed dates that we had

2    given on our original thing.

3              THE COURT:  Right.

4              MR. GERSHENSON:  I just want to confirm, so

5    there's not -- there's clarity among the parties that

6    those other dates that are now -- that we proposed in

7    our motion, I guess it was document 250 --

8              THE COURT:  Yeah, we're going to do -- I will

9    adopt those; okay?

10             MR. GERSHENSON:  Thank you, Your Honor.

11             THE COURT:  I didn't because you had a crisis on

12   the expert report --

13             MR. GERSHENSON:  Yes.  No.  We appreciate that.

14             THE COURT:  -- and I just didn't have a chance

15   to look at the rest of it.

16             Okay, so we'll adopt that as the new schedule --

17             MR. GERSHENSON:  Thank you, Your Honor.  Much

18   appreciated.

19             THE COURT:  -- for all items.

20             I'm going to caution you now, though, when you

21   file summary judgments, if you want a ruling in time

22   before the trial, make sure that it's a limited and

23   focused question because the more complex you make it,

24   the longer it will take us to do; okay?

25             MR. GERSHENSON:  Thank you.

1           THE COURT:  So -- and then I could always write

2      "denied" at the last minute.  Okay, thank you.

3           MR. GERSHENSON:  Thank you, Your Honor.

4           MR. POPEO:  Thank you, Your Honor.

5           THE CLERK:  Court is in recess.

6           (Adjourned, 5:24 p.m.)

1

2          C E R T I F I C A T I O N

3

4

5

6

7

8

9          I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10   hereby certify that the foregoing pages are a true and

11   accurate transcription of my stenographic notes (from

12   audio) in the above-entitled case.

13

14

15

16

17

18          /s/ Debra D. Lajoie

19

20

21

22

23          12/24/15

24

25